1  QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
     George R. Hedges (Bar No. 081873)
2    Stan Karas (Bar No. 222402)
   865 South Figueroa Street, 10th Floor
3  Los Angeles, California  90017-2543
   Telephone:  (213) 443-3000
4  Facsimile:  (213) 443-3100
   Email:      georgehedges@quinnemanuel.com
5              stankaras@quinnemanuel.com

6  BAKER MARQUART CRONE & HAWXHURST LLP
   Jaime W. Marquart (Bar No. 200344)
7  Daryl M. Crone (Bar No. 209610)
   Email:      jmarquart@bmchlaw.com
8  Email:      dcrone@bmchlaw.com
9  10990 Wilshire Blvd., Fourth Floor
   Los Angeles, California  90024
10 Telephone:  (310) 575-3800
   Facsimile:  (310) 575-3802
11
   Attorneys for Defendants
12 Warner Bros. Entertainment, Inc., Radar Pictures,
   Inc., Bedford Falls Company (erroneously sued as
13 Bedford Falls Productions, Inc.), Edward Zwick,
   Marshall Herskovitz and John Logan
14
                    UNITED STATES DISTRICT COURT
15
                   CENTRAL DISTRICT OF CALIFORNIA
16
                          WESTERN DIVISION
17

| | |
|---|---|
| AARON BENAY, an individual, *et al.*, | CASE NO. CV 05-8508 PSG (FMOx) |
| Plaintiffs, | **DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES** |
| v. | |
| WARNER BROS. ENTERTAINMENT, INC., a Delaware corporation, *et al.*, | [Declarations of Edward Zwick and Jaime W. Marquart; Separate Statement of Uncontroverted Material Facts and Conclusions of Law; Notice of Lodging; and Proposed Order filed herewith] |
| Defendants. | Date:  February 11, 2008<br>Time:  1:30 p.m.<br>Ctrm.:  790 |
| | Date Filed:  December 5, 2005<br>Trial Date:  March 11, 2008 |

18
19
20
21
22
23
24
25
26
27
28

{00008596.DOC - v1}

TO THE CLERK OF COURT AND TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT on February 11, 2008, at 1:30 p.m., or as soon thereafter as counsel may be heard before the Honorable Philip S. Gutierrez, in Courtroom 790 of the above-entitled Court, located at 255 East Temple Street, Los Angeles, California 90012, Defendants Warner Bros. Entertainment, Inc., Radar Pictures, Inc., The Bedford Falls Company (erroneously sued as Bedford Falls Productions, Inc.), Edward Zwick, Marshall Herskovitz and John Logan ("Defendants") will, and hereby do, move pursuant to <u>Fed. R. Civ. P.</u> 56 for an order entering summary judgment in their favor and against plaintiffs Aaron Benay and Matthew Benay on the First Amended Complaint and all causes of action set forth therein.

Good cause exists to grant this motion.  Plaintiffs' First Claim for Relief of copyright infringement fails as a matter of law because the only elements common to both screenplays are historical ones that are not copyrightable.  But even if those elements were copyrightable, there is no factual dispute that Defendants' screenplay was independently created by them before Plaintiffs allegedly "pitched" their ideas to an executive at Defendant Bedford Falls (a claim Defendants vehemently deny but assume for purposes of this motion).  This undisputed fact of independent creation likewise defeats Plaintiffs' Second Claim for Relief for breach of implied contract.

This motion is made following the conference of counsel pursuant to <u>Local Rule</u> 7-3 which took place on November 20, 2007.

This motion is based upon this notice of motion; the attached Memorandum of Points and Authorities; the concurrently submitted Declarations of Edward Zwick and Jaime W. Marquart; the concurrently submitted Notice of Lodging; all pleadings and other records on file in this action; and such further evidence and arguments as may be presented at or before any hearing on the motion.  A Separate Statement of

1   Uncontroverted Material Facts and Conclusions of Law, and a Proposed Order, are

2   respectfully lodged herewith.

3

4   DATED:  January 11, 2008          QUINN EMANUEL URQUHART OLIVER & HEDGES LLP

5                                     BAKER MARQUART CRONE & HAWXHURST LLP

6

7                                     By___/s/ George R. Hedges_____

8                                         George R. Hedges
                                          Attorneys for Defendants Warner Bros.
9                                         Entertainment, Inc., Radar Pictures, Inc.,
                                          Bedford Falls Company (erroneously sued as
10                                        Bedford Falls Productions, Inc.), Edward
                                          Zwick, Marshall Herskovitz and John Logan

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 2 -
DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

1

## **<u>TABLE OF CONTENTS</u>**

2

<u>Page</u>

3

4

MEMORANDUM OF POINTS AND AUTHORITIES.............................................1

5

Preliminary Statement ...............................................................................1

6

Statement of Undisputed Facts ...............................................................3

7

      A.     Defendants' Conception and Development of the Basic Elements of *The Last Samurai* in Late 1999 and Early 2000. .................................3

8

      B.     A Synopsis of *The Last Samurai* ................................................6

9

      C.     Plaintiffs Use The Same Historical Events To Write A Screenplay That Otherwise Differs Entirely From Defendants' Work.............................................................................................7

10

11

Argument .................................................................................................9

12

I.      SUMMARY JUDGMENT SHOULD BE ENTERED IN FAVOR OF DEFENDANTS ON THE FIRST CLAIM FOR RELIEF BECAUSE (A) THEY INDEPENDENTLY CREATED *THE LAST SAMURAI* PRIOR TO ANY ALLEGED ACCESS AND (B) THE WORKS AT ISSUE ARE NOT SUBSTANTIALLY SIMILAR .........................................9

13

14

15

      A.     Defendants Independently Conceived *The Last Samurai*.......................9

16

      B.     Even Absent Independent Creation, the Works At Issue Are Not Substantially Similar ..............................................................11

17

            1.     Any similar elements between the works derive from historic fact or generic plotlines and hence are not protectible. ....................................................................12

18

19

            2.     The works are clearly *dis*similar once the non-protectible elements are set to the side. ...........................................17

20

                  (a)     Characters ..................................................................17

21

                  (b)     Plot.............................................................................19

22

                  (c)     Themes ......................................................................20

23

                  (d)     Setting .......................................................................21

24

                  (e)     Mood .........................................................................21

25

                  (f)     Pace............................................................................22

26

                  (g)     Sequence of Events .................................................22

27

28

{00008596.DOC - v1}

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

(h)     Dialogue ............................................................................. 23

II.     SUMMARY JUDGMENT SHOULD BE ENTERED IN FAVOR OF ALL DEFENDANTS AND AGAINST PLAINTIFFS ON THEIR CLAIM FOR BREACH OF IMPLIED CONTRACT ..................................... 24

Conclusion ............................................................................................... 25

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>Page</u>

3

<u>Cases</u>

Anderson v. Paramount Pictures Corp.,
    617 F. Supp. 1 (C.D. Cal. 1985)...................................................................... 21

Benjamin v. Walt Disney Co.,
    2007 WL 1655783 (C.D. Cal. June 5, 2007)....................................................... 9

Berkic v. Crichton,
    761 F.2d 1289 (9th Cir. 1985) ................................................................... 11, 20

Cavalier v. Random House,
    297 F.3d 815 (9th Cir. 2002) ............................................................... 12, 16, 23

Chase-Riboud v. DreamWorks, Inc.,
    987 F. Supp. 1222 (C.D. Cal. 1997) ............................................................... 15

Denker v. Uhry,
    820 F. Supp. 722 (S.D.N.Y. 1992) ................................................................. 16

Desny v. Wilder,
    46 Cal. 2d 715, 299 P.2d 257 (1956)............................................................... 24

Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.,
    109 F.3d 1394 (9th Cir. 1997) ....................................................................... 15

Echevarria v. Warner Bros. Pictures, Inc.,
    12 F. Supp. 632 (S.D. Cal. 1935) ................................................................... 12

Ets-Hokin v. Skyy Spirits, Inc.,
    225 F.3d 1068 (9th Cir. 2000) ....................................................................... 12

Funky Films, Inc. v. Time Warner Entm't Co.,
    462 F.3d 1072 (9th Cir. 2006) ................................................................... 11, 17

Grosso v. Miramax Film Corp.,
    383 F.3d 965 (9th Cir. 2004) ......................................................................... 24

Hollywood Screentest of Am., Inc. v. NBC Universal, Inc.,
    151 Cal. App. 4th 631, 60 Cal. Rptr. 3d 279 (2007) ................................... 24, 25

Idema v. DreamWorks, Inc.,
    162 F. Supp. 2d 1129 (C.D. Cal. 2001) ........................................................... 23

Klekas v. EMI Films, Inc.,
    150 Cal. App. 3d 1102, 198 Cal. Rptr. 296 (1984) ........................................... 24

Kouf v. Walt Disney Pictures & Television,
    16 F.3d 1042 (9th Cir. 2004) ............................................................... 11, 17, 23

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

<u>Litchfield v. Spielberg</u>,
   736 F.2d 1352 (9th Cir. 1984) ........................................................ 13, 20

2

3

<u>Mann v. Columbia Pictures, Inc.</u>,
   128 Cal. App. 3d 628, 180 Cal. Rptr. 522 (1982) ................................. 25

4

<u>Metcalf v. Bochco</u>,
   294 F.3d 1069 (9th Cir. 2002) ............................................................. 11

5

6

<u>Narell v. Freeman</u>,
   872 F.2d 907 (9th Cir. 1989) ............................................................... 12

7

<u>Olson v. Nat'l Broadcasting Co.</u>,
   855 F.2d 1446 (9th Cir. 1988) ............................................................. 23

8

9

<u>Shaw v. Lindheim</u>,
   809 F. Supp. 1393 (C.D. Cal. 1992) ...................................................... 9

10

<u>Shaw v. Lindheim</u>,
   919 F.2d 1353 (9th Cir. 1990) ............................................................. 11

11

12

<u>Swirsky v. Carey</u>,
   376 F.3d 841 (9th Cir. 2004) ............................................................... 11

13

<u>Williams v. Crichton</u>,
   84 F.3d 581 (2d Cir. 1996) .................................................................. 12

14

15

**<u>Miscellaneous</u>**

16

1 M. Nimmer & D. Nimmer, NIMMER ON COPYRIGHT § 2.11 (2007) ....................... 12

17

1 M. Nimmer & D. Nimmer, NIMMER ON COPYRIGHT § 2.16 (2007) ....................... 15

18

4 M. Nimmer & D. Nimmer, NIMMER ON COPYRIGHT § 13.01[B] ............................ 9

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

### Preliminary Statement

If two writers <u>independently</u> write screenplays involving a stock character confronting the same historical events (here an American war veteran in 1870's Japan) but otherwise create different plots, characters and dialogue, can one hold the other liable for copyright infringement and idea theft?  The law says no.

This case involves two works:  Defendants' film "*The Last Samurai*" and Plaintiffs' unpublished screenplay (the "Benay screenplay").[1]  Both works are based on an American war veteran's confrontation with historical events that occurred in Japan in the 1870's:  (1) the Japanese Emperor's introduction of Western military technologies and strategies; (2) the rebellion of the samurai against the Emperor and those Western military influences (the "Satsuma Rebellion"); and (3) the rise and fall of a samurai named Saigo Takamori (who history knows as the "Last Samurai").  Historical events are not protected by copyright or any other legal theory.

Here, as documentary evidence unequivocally demonstrates, Defendants Edward Zwick and John Logan conceived of a film based on these historical events in <u>April of 2000</u>, weeks <u>before</u> they allegedly ever came into contact with the Benay screenplay.[2]  Specifically, before Plaintiffs allegedly "pitched" their screenplay to Defendant Bedford Falls on <u>May 9, 2000</u>, Zwick and Logan already had conceived of a drama in which an American war veteran comes to Japan during the 1870's, confronts the modernization of the Japanese military establishment, and becomes

---

[1] Defendants have submitted a copy of the 2-Disc Widescreen Edition DVD of *The Last Samurai* and a copy of Plaintiffs' screenplay with this motion as Exhibit I to the Declaration of Edward Zwick ("Zwick Dec.") and Exhibit B to the Declaration of Jaime W. Marquart ("Marquart Dec."), respectively.  Defendants respectfully urge the Court to review each.  It is critical to the determination of this motion.

[2] Defendants vehemently deny any knowledge whatsoever of Plaintiffs' screenplay before this case but will assume access for purposes of this motion.

1  involved with the Satsuma Rebellion and the Last Samurai, Saigo Takamori.  This
2  undisputed evidence of independent creation is fatal to Plaintiffs' First Claim for
3  Relief (Copyright Infringement).  Independent creation also defeats Plaintiffs'
4  Second Claim for Relief (Breach of Implied Contract).  If those elements common
5  to the two projects were already in Defendants' possession before Defendants
6  supposedly received Plaintiffs' pitch then there is no consideration for any idea the
7  Plaintiffs supposedly gave to Defendant Bedford Falls.[3]

8        Plaintiffs' First Claim for Relief is also deficient because the works are not
9  substantially similar when it comes to their copyright-***protectible*** elements.  Again,
10 history is not copyrightable.  Accordingly, Plaintiffs cannot survive a motion for
11 summary judgment by demonstrating that the same historical references and
12 dramatic events that would naturally flow from those references (known in
13 copyright law as "scènes à faire") appear in both works.  For example, if an
14 American war veteran is in Japan in the 1870's, he can be either a veteran of (a) the
15 Civil War (as in the Benay screenplay) or (b) the Indian Campaigns (as in
16 Defendants' film).  A choice of either option does not give rise to a viable claim
17 under any legal theory.  The same goes for the next inevitable step:  because of his
18 knowledge of modern warfare the veteran becomes involved with the Emperor's
19 efforts to create a modern army.  And the next inevitable step:  he comes into
20 conflict with the samurai (who were rebelling against these efforts) and thereby
21 confronts the Last Samurai, Saigo Takamori.  These are historical events driven by
22 scènes à faire, not plot contrivances that are subject to copyright protection.  And
23 once these non-copyrightable elements are set to the side, the Benay screenplay is
24 not at all similar to *The Last Samurai* in its characters, plot, themes, dialogue, mood,

25

26

27  [3] Defendant Bedford Falls is a production company owned by Defendants
    Edward Zwick and Marshall Herskovitz.

28

1  setting, pace or sequence of events, and no copyright or idea theft claim can be

2  established as a matter of law.

3      Thus, summary judgment should be entered in Defendants' favor on all claims

4  in the First Amended Complaint.[4]

5  ### Statement of Undisputed Facts

6  **A.    Defendants' Conception and Development of the Basic Elements of**

7  ***The Last Samurai* in Late 1999 and Early 2000.**

8      In 1999, Ed Zwick (an Academy Award winning producer, director and

9  writer, whose film credits include *Glory, Legends of the Fall, Courage Under Fire,*

10  *The Siege, Shakespeare in Love* and *Traffic*) and John Logan (an Academy Award

11  winning writer whose credits include *Gladiator, Any Given Sunday, The Aviator* and

12  *Sweeney Todd*) joined forces to write the screenplay that became the hit film *The*

13  *Last Samurai*. (Zwick Dec., ¶¶ 14-20.[5])  The two knocked around a number of

14  ideas, but one resonated with both.  Since his undergraduate days at Harvard, Zwick

15  had been fascinated with Japanese culture and the samurai films of Akira Kurosawa.

16  Indeed, he had written a screenplay early in his career about an embittered America

17  military veteran who regains his sense of life through his clashes with, and then

18  assimilation into, an alien Eastern culture.  (Id. ¶¶ 2-3 & Ex. A.)

19      Moreover, in 1997, Zwick was attached to direct a screenplay developed by

20  Defendant Radar Pictures[6], then known as *West of the Rising Sun*, dealing with this

21  subject:  "An American Civil War veteran journeys to Japan in 1871 during the

22

23      [4] The Court dismissed Plaintiffs' Third Claim for Relief for interference of
24  contract by Orders dated July 17 and 20, 2006.  (Marquart Dec., Exs. C and D.)

25      [5] In his Declaration Defendant Zwick details the many influences that led to the
   creation of *The Last Samurai* including the films of Akira Kurosawa, *Lawrence of*
26  *Arabia*, *Shogun*, *Dances With Wolves* and others. (Zwick Dec., ¶¶ 2, 13, 15-19.)

27      [6] Defendant Radar Pictures is an independent motion picture company based in
   Los Angeles.  It was a co-producer of *The Last Samurai*.

28

country's own civil war and he finds himself leading the first Samurai cattle drive. His adventure helps him reaffirm the meaning of life and the will to live it well." (Zwick Dec., ¶ 12 & Ex. B.)  Radar Pictures and its predecessor had been creatively developing the *West of the Rising Sun* project since 1992.  (Id.)

In late 1999, Zwick conceived of his own approach to a Westerner confronting Japanese culture – an "Eastern Western" that would combine elements of the great Japanese samurai films with American culture as it existed in the 1870's, the era depicted in the great Westerns of American film.  At the same time, the film would reflect Zwick and Logan's interest in the historical experiences of Western military men such as Jules Brunet and Captain L. L. Janes, who ventured into Japan at that time and were involved with the Westernization of the Japanese military. (Zwick Dec., ¶ 15.)

Zwick described the elements of this "Eastern Western" that became *The Last Samurai* in a fax to Logan on April 12, 2000 (Zwick Dec., Ex. K):

- *The End of Samurai Culture.*  Zwick writes that the film will be "a story about a transitional moment [that] colors everything with such beautiful sadness and dignity:  in this case the last breath of the Edo dynasty, the end of the Shogunate, and the death agonies of Samurai culture."  (Id.)
- *A Tortured Western Protagonist With a Violent Past.*  Zwick writes that the Western protagonist will be:  "a man who has seen enough war, enough bloodshed for several lifetimes – who is forced to accept that there are still things worth fighting for.  A man who has abjured his extraordinary powers of destruction – who must own his truest, most violent nature."  (Id.)
- *The Eastern Character Whose Way of Life Is Ending.*  The counterpart to the Western protagonist will be a man, one of the samurai, whose way of life is ending:  "I see this man in close and necessary relationship to

1      another kind of warrior – a Samurai – whose way of life, indeed whose

2      whole purpose in life, no longer has a place in the world." (<u>Id.</u>)

3      •   *The Western and Eastern Characters Ultimately Fight Together and Earn*

4      *Mutual Respect.* The Western protagonist will come to befriend his

5      Eastern counterpart: "I imagine that together they battle a common enemy

6      [and] come to some mutual respect." (<u>Id.</u>)

7      On April 18, 2000, Logan responded to Zwick with a faxed note reflecting his

8 having researched Japanese history, noting "in particular the internet item on the

9 Satsuma Rebellion" and asking Zwick to "track down some complete books on the

10 Satsuma Rebellion." (Zwick Dec., ¶ 23 & Ex. L.) Zwick replied later that same day

11 with additional historical facts about the end of the samurai. (Zwick Dec., ¶ 24 &

12 Ex. M.) Then, on April 19, Logan sent Zwick a short note on the history of the

13 samurai sword. (Zwick Dec., ¶ 25 & Ex. N.) Through these and other exchanges

14 before April 22, 2000, Zwick and Logan developed the following additional

15 elements of their screenplay:

16      •   *The Samurai Resist Modern Weaponry, and, After Being Defeated, the*

17      *"Last of the Samurai" Commits Suicide.* On April 20, 2000, Logan wrote

18      that, after the samurai were forced to turn in their swords, Saigo Takamori

19      "found it too much to bear and led an army of followers in the Satsuma

20      Rebellion." (Zwick Dec., ¶ 27 & Ex. P.) He adds: "They fought as

21      bravely as the samurai of old, but they were no match for modern rifles

22      and cannon. Saigo Takamori ended his life in grand style by committing

23      hara-kiri. He was the *last of the samurai* …." (<u>Id.</u> (emphasis added).)

24      •   *The Western Protagonist Helps his Eastern Counterpart Commit Suicide.*

25      Also on April 20, Logan shared his idea for the climactic involvement of

26      the Western protagonist in the Saigo Takamori character's suicide: "He

27      asked his best friend (*our Western hero*?) to hold his sword. Then he

28      impaled himself like Mordred …." (<u>Id.</u> (emphasis added).)

- *The Western Protagonist is an American Military Advisor.* On April 21, Zwick and Logan exchanged historical pages which, among other things, described the real-life account of an "advisor in Western naval and military strategies, … Captain Leroy Janes, a retired U.S. army general." (Zwick Dec., ¶ 29 & Ex. R.)  The entire account of Captain Leroy Lansing Janes is set forth in *American Samurai:  Captain L.L. Janes and Japan*, a book written by F. G. Notehelfer and published in 1985, upon which Zwick relied in developing *The Last Samurai*.  (Zwick Dec., ¶¶ 15, 28 & Ex. Q.)

### B.     A Synopsis of *The Last Samurai*

In Defendants' film, the protagonist Nathan Algren (Tom Cruise) is a haunted and dissolute veteran of the Indian Campaigns, in which the United States ruthlessly destroyed a traditional culture.  Algren's former commanding officer hires him to accompany him to Japan on behalf of Omura, a Westernized Japanese businessman, to train the Emperor's new peasant army using modern weapons.  (Zwick Dec., Ex. I at Chapters 3 & 6.)

Soon Algren is forced to take the fledgling army into battle against an army of samurai led by Katsumoto, the Saigo Takamori (Last Samurai) character.  (Id. at Chapters 8-9.)  Algren's troops are decimated and he is captured.  Katsumoto takes him to his village, where Algren begins to learn the way of the samurai.  (Id. at Chapter 11.)  Algren also meets Taka, the beautiful widow of a samurai Algren had killed.  A deep relationship begins to develop between the two as Algren comes to appreciate the beauty of traditional Japanese culture.  Algren's soul is restored during his captivity and he earns the respect and admiration of his captors, especially when he helps them beat back a ninja attack.  (Id. at Chapters 11-19.)

Algren is allowed to return to Tokyo, where Katsumoto is imprisoned.  Algren helps him escape.  They learn that the imperial army, re-equipped and trained, is marching out to do battle with the samurai.  Algren joins the samurai in

1   their last stand.  (<u>Id.</u> at Chapters 30-37.)   Fighting valiantly, they are decimated and

2   Katsumoto commits ritual suicide with Algren's help.  (<u>Id.</u> at Chapter 38.)  Algren

3   returns to Tokyo to present Katsumoto's sword to the Emperor.  There he convinces

4   the Emperor not to conclude an arms treaty with the United States.  (<u>Id.</u> at

5   Chapter 39.)  Algren then returns to Taka and the traditional Japanese way of life he

6   has come to love.

7          **C.**      <u>**Plaintiffs Use The Same Historical Events To Write A Screenplay**</u>

8                   <u>**That Otherwise Differs Entirely From Defendants' Work.**</u>

9          On May 9, 2000 -- *after* the April 2000 exchanges between Zwick and Logan

10  that created the essential historical setting, characters and plot of *The Last*

11  *Samurai* -- Plaintiffs allege their agent orally pitched Plaintiffs' ideas to a Bedford

12  Falls executive.  (Marquart Dec. Ex. E ¶ 18 & Ex. F at Nos. 11-12.)  On May 16,

13  2000, Plaintiffs allege their agent provided a written copy of the screenplay to

14  Bedford Falls and no other party.  (Marquart Dec. Ex. E ¶ 19 & Ex. F at Nos. 11-

15  12.)  Their screenplay uses certain historical references found in *The Last Samurai*,

16  but is otherwise entirely different in execution.

17         The Benay screenplay focuses its "American" storyline on a West Point

18  professor who is married to the daughter of an arrogant American arms

19  manufacturer.  (Marquart Dec. Ex. B at 2, 28-30, 32, 84.)  James Gamble, the hero

20  of the story, is a former officer in Ulysses S. Grant's civil war army who, amidst the

21  confusions of the Battle of the Wilderness, accidentally shot eight of his own men.

22  (<u>Id.</u> at 103-104.)  Grant excused the mistake but assured Gamble that at some point

23  he would call on him to return the favor.  (<u>Id.</u>)  The screenplay begins with Gamble

24  happily engaging in a snowball fight with his students.  (<u>Id.</u> at 4.)  Then Gamble is

25  sent by Grant (a payback for Grant's pardon of Gamble in the Battle of the

26  Wilderness incident) to Japan to assist the Emperor, who is attempting to modernize

27  his country and build a national army to suppress the samurai chieftains.  (<u>Id.</u> at 9-

28  11.)

Plaintiffs' "Last Samurai" character (based, like Defendants', on the historical figure Saigo Takamori) is ruthless and treacherous. (<u>Id.</u> at 17, 83, 93-94, 122.) He deceives the Emperor into believing that Lord Eto is behind a wave of attacks on foreigners. (<u>Id.</u> at 35, 52, 83, 93-94.) The Emperor commands Gamble to lead his forces against Eto, which Gamble reluctantly does, ultimately delivering Eto's head to the Emperor. (<u>Id.</u> at 35-50.)

Meanwhile, Gamble's wife and young son, and later his father-in-law, follow him to Japan. (<u>Id.</u> at 53-54, 82.) Seeking revenge on behalf of Lord Eto, Saigo Takamori attacks a Christian church and kills, among others, the Gambles' son Trevor. (<u>Id.</u> at 58-61.)

Now seeking revenge himself, Gamble attacks Lord Eto's son Maebara and in a disastrous battle in the rain, Gamble's heavily equipped troops are decimated by Maebara's samurai. (<u>Id.</u> at 69-81.) In despair over his defeat and humiliated by his wife (who calls him a failure), Gamble retreats to a Japanese opium den where he has flashbacks to the time when he mistakenly shot his own men in the Battle of the Wilderness. (<u>Id.</u> at 82, 85-87.)

Help for James Gamble appears in the form of Masako, a female samurai warrior who abandons Saigo, rescues Gamble from the opium den, and leads him and his wife to a Buddhist temple. (<u>Id.</u> at 89-93.) There, together with Masako's brother, a warrior-monk, they plan an attack on Saigo at his base on the island of Iwo Jima. (<u>Id.</u> at 94-100.) After a sea-battle near the island, Gamble and Masako pursue Saigo through a secret tunnel to the volcanic peak of Mt. Suribachi. (<u>Id.</u> at 109-122.) A duel ensues in which Masako sacrifices herself to save Gamble, who cuts off Saigo's head and proclaims himself "the last samurai." (<u>Id.</u> at 122-123.) The Benay screenplay concludes with a coda that returns to West Point, where the Gambles have redecorated their house in Japanese style and named their new daughter in honor of the female samurai who sacrificed herself for him. (<u>Id.</u> at 125-126.)

**Argument**

**I.**   **SUMMARY JUDGMENT SHOULD BE ENTERED IN FAVOR OF DEFENDANTS ON THE FIRST CLAIM FOR RELIEF BECAUSE (A) THEY INDEPENDENTLY CREATED *THE LAST SAMURAI* PRIOR TO ANY ALLEGED ACCESS AND (B) THE WORKS AT ISSUE ARE NOT SUBSTANTIALLY SIMILAR**

   **A.**   **Defendants Independently Conceived *The Last Samurai*.**

   In this case there can be no reasonable dispute that, before any Defendant allegedly ever saw or heard of the Benay screenplay, Zwick and Logan had independently conceived of the basic elements of *The Last Samurai* and that Defendants' screenplay is an independent creation from these elements. Independent creation necessarily defeats Plaintiffs' copyright claim. Shaw v. Lindheim, 809 F. Supp. 1393, 1402 (C.D. Cal. 1992) ("If the similarities between [two] works are the result of independent creation, rather than of copying, there is no copyright infringement."); see also 4 M. Nimmer & D. Nimmer, NIMMER ON COPYRIGHT § 13.01[B], p. 13-10 (2007) ("[E]ven when two works are substantially similar with respect to protectible expression, if the defendant did not copy as a factual matter, but instead independently created the work at issue, then infringement liability must be denied.").[7]

   The undisputed facts reflect that, in April of 2000, Zwick and Logan independently conceived *all* of the central elements of the film:

   ―――――――――――――

   [7] Stated differently, the Court should "filter out" from its infringement analysis any elements of *The Last Samurai* which the Defendants independently conceived prior to their alleged exposure to the Benay screenplay in May of 2000. See Benjamin v. Walt Disney Co., 2007 WL 1655783, at *4 (C.D. Cal. June 5, 2007) (Schiavelli, J.) ("Because Plaintiffs cannot establish access as a matter of law prior to May 1998, the Court must filter out all material created prior to the beginning of the SweetHome project at Disney.").

1    • The protagonist of their film would be an American war veteran.

2       (Zwick Dec., ¶¶ 12, 15, 22 & Exs. K, R.)

3    • The protagonist would be based on historical accounts of Westerners

4       who had advised the Emperor on military strategies in late 19th

5       Century Japan.  (Zwick Dec., ¶¶ 15, 29 & Exs. Q, R.)

6    • The protagonist would be scarred by his war experiences but

7       nonetheless be "forced to accept that there are still things worth

8       fighting for."  (Zwick Dec., ¶¶ 15, 22 & Ex. K.)

9    • It would concern "the death agonies of Samurai culture" (Zwick Dec.,

10      ¶ 22 & Ex. K), during the 1870's, the time of the Satsuma Rebellion.

11      (Zwick Dec., ¶¶ 23, 29 & Exs. L, R.)

12   • The Eastern counterpart would be based upon Saigo Takamori, the

13      leader of the Satsuma Rebellion, who is known as "the last of the

14      samurai …."  (Zwick Dec., ¶ 27 & Ex. P.)

15   • The protagonist would come to have a close relationship with his

16      Eastern counterpart.  (Zwick Dec., ¶¶ 22, 27, Exs. K, P.)

17   • The protagonist and the Saigo character would befriend one another,

18      fight together, and earn mutual respect.  (Zwick Dec., ¶¶ 22, 27 &

19      Exs. K, P.)

20   • The Saigo character and his followers would be decimated in a

21      climactic battle by the Japanese Emperor's modern weaponry, after

22      which Saigo commits ritual suicide.  (Zwick Dec., ¶ 27 & Ex. P.)

23   • The protagonist would assist Saigo in committing suicide.  (Id.)

24   (See also Zwick Dec. ¶ 31.)

25      Taken together, these are the core elements of *The Last Samurai*.  All of the

26   alleged common elements between *The Last Samurai* and the Benay screenplay

27   either consist of these core elements or flow directly from them and their historical

28

1    context.  Because Zwick and Logan conceived of them prior to any alleged exposure

2    to Plaintiffs' work, the copyright claim fails as a matter of law.

3        **B.**    **Even Absent Independent Creation, the Works At Issue Are Not**

4              **Substantially Similar**

5        The Ninth Circuit has "'frequently affirmed summary judgment in favor of

6    copyright defendants on the issue of substantial similarity.'"  Funky Films, Inc. v.

7    Time Warner Entm't Co., 462 F.3d 1072, 1077 (9th Cir. 2006) (quoting Shaw v.

8    Lindheim, 919 F.2d 1353, 1355 (9th Cir. 1990)).  On a motion for summary

9    judgment, the Court need only apply an extrinsic, objective test on the subject.[8]  In

10   applying the extrinsic test, the Court "'compares, not the basic plot ideas for stories,

11   but the actual concrete elements that make up the total sequence of events and the

12   relationships between the major characters.'"  Id. (quoting Berkic v. Crichton, 761

13   F.2d 1289, 1293 (9th Cir. 1985)).  For example, "'[g]eneral plot ideas are not

14   protected by copyright law; they remain forever the common property of artistic

15   mankind.'"  Id. at 1081(quoting Berkic, 761 F.2d at 1293).  Likewise, scènes à faire,

16   which are scenes that flow naturally from generic plot-lines, cannot be protected.

17   See Metcalf v. Bochco, 294 F.3d 1069, 1074 (9th Cir. 2002) ("One cannot copyright

18   the idea of an idealistic young professional choosing between financial and

19   emotional reward, or of love triangles among young professionals that eventually

20   become strained, or of political forces interfering with private action."); see also

21   Swirsky v. Carey, 376 F.3d 841, 850 (9th Cir. 2004) ("Under the scènes à faire

22

23      [8] By contrast, the intrinsic test, which examines an ordinary person's subjective
24   impressions of the similarities between two works, is exclusively the province of the
     jury and not amenable to resolution on summary judgment.  See Shaw, 919 F.2d at
25   1360-61.  However, a "plaintiff who cannot satisfy the extrinsic test necessarily
26   loses on summary judgment, because a jury may not find substantial similarity
     without evidence on both the extrinsic and intrinsic tests."  Kouf v. Walt Disney
27   Pictures & Television, 16 F.3d 1042, 1045 (9th Cir. 2004).

28

doctrine, when certain commonplace expressions are indispensable and naturally associated with the treatment of a given idea, those expressions are treated like ideas and therefore not protected by copyright.").  In addition, pursuant to the merger doctrine, "courts will not protect a copyrighted work from infringement if the idea underlying the copyrighted work can be expressed in only one way, lest there be a monopoly on the underlying idea." Ets-Hokin v. Skyy Spirits, Inc., 225 F.3d 1068, 1082 (9th Cir. 2000).

When engaging in this extrinsic analysis, the Court "must take care to inquire only whether 'the *protectible elements,* standing *alone,* are substantially similar.'" Cavalier v. Random House, 297 F.3d 815, 822 (9th Cir. 2002) (*quoting* Williams v. Crichton, 84 F.3d 581, 588 (2d Cir. 1996)) (emphasis in original).

### 1. Any similar elements between the works derive from historic fact or generic plotlines and hence are not protectible.

In this case, there are no substantially similar **protectible** elements.  The works before the Court share the same historical backdrop of Japan in the 1870's: the Japanese Emperor's introduction of Western military technologies and strategies; the Satsuma Rebellion; and the rise and fall of "the last of the samurai," Saigo Takamori.  (Zwick Dec., ¶¶ 15, 27, 29 & Exs. P, R; Marquart Dec., Exs. G, I & J.) Such historical facts cannot be protected by copyright.  See, e.g., Narell v. Freeman, 872 F.2d 907, 910-11 (9th Cir. 1989) ("Historical facts and theories may be copied, as long as the defendant does not 'bodily appropriate' the expression of the plaintiff."); see also 1 M. Nimmer & D. Nimmer, NIMMER ON COPYRIGHT § 2.11, p. 2-178.7 (2007) ("'One cannot build a story around a historical incident and then claim exclusive right in the use of the incident.' [ … ]  The courts have denied copyright protection … to historical facts ….") (*quoting* Echevarria v. Warner Bros. Pictures, Inc., 12 F. Supp. 632, 638  (S.D. Cal. 1935)).

At the outset, it must be noted that the Ninth Circuit has warned that lists of similarities framed by a plaintiff are "inherently subjective and unreliable,"

particularly when the list "emphasizes random similarities scattered throughout the works."  <u>Litchfield v. Spielberg</u>, 736 F.2d 1352, 1356 (9th Cir. 1984).  Yet here, each of Plaintiffs' listed similarities, none of which Plaintiffs claim "is in and of itself substantial" (<u>see</u> Marquart Dec., Ex. F (Responses to Interrogatories) at No. 13), flow naturally from historical and/or generic (and unprotectable) elements:

- *The Protagonist in Each Work is a Former Civil War Officer.*  Given that both works involve a Westerner confronting the Emperor's modernization of the Japanese army and the samurai reaction, it is hardly surprising that the hero in each work has a military background; otherwise, the hero would be unable to participate in the action with any real competence or expertise.  Of course, the protagonist in *The Last Samurai*, Nathan Algren, is a veteran not only of the Civil War but also of the Indian Campaigns, and his participation in the eradication of Native American culture shapes his choice to fight alongside the Last Samurai.  By contrast, James Gamble, the protagonist in Plaintiffs' screenplay, fought only in the Civil War, and he never joins the samurai cause.

- *The Protagonist in Each Work is Hard-Drinking, Embittered, Guilt-Ridden, and Suffers War Flashbacks.*  With any war veteran often comes some degree of weariness or loss, and the war veteran experiencing flashbacks is a staple of cinema (for example, in *Rambo*).  In any event, in April 2000, Zwick already had conceived of his protagonist as being "a man who has seen enough war, enough bloodshed for several lifetimes …."  (Zwick Dec., ¶ 22 & Ex. K.)  All of these characteristics of Defendants' protagonist flow naturally from any description of a war veteran who has been witness to great violence.

- *The Protagonist is a "Fish-Out-of-Water."*  Of course, **any** American traveling to the closed society of 1870's Japan would have been a "fish-out-of-water."  The clash of cultures flows from the setting.  Thus, on

April 12, Zwick wondered:  "What do they teach each other (besides flower-arranging, koans, and the tea ceremony)?"  (Zwick Dec., ¶ 22 & Ex. K.)

- *The Protagonist is a Strong Leader, an Excellent Swordsman and Known to Employ Trickery in Warfare.*  It is hardly surprising that an American war veteran from the 1870's would be skilled as a swordsman or in military tactics, or be able to lead men in battle.  In fact, as noted in historical accounts exchanged between Zwick and Logan on April 21, 2000, Captain Leroy Janes, a retired U.S. army general, was a real historical figure who acted as Japan's "advisor in Western naval and military strategy."  (Zwick Dec., ¶ 29 & Ex. R.)

- *The Protagonist is Recruited by the Emperor to Train the Imperial Army, Composed of Peasants, in Modern War Strategies.*  As noted above, by April 2000 Zwick and Logan already had conceived of their protagonist as being a war veteran, and had in fact conducted research regarding an American military advisor who had come to Japan to advise it on Western military strategy.  (Zwick Dec., ¶¶ 22, 29 & Exs. K, R.)  From these historically-based ideas, it naturally follows that the protagonist would be involved in some way with the Emperor's modernization efforts using a peasant army.

- *The Protagonist Leads the Imperial Army Against the Samurai.*  If the protagonist is a military advisor to the modernizing Japanese Emperor in the 1870's, this would -- as a matter of historical fact -- put him in direct conflict with the samurai, who were rebelling against these efforts.  Thus, again, the historical accounts exchanged between Logan and Zwick on April 21 state, "[Saigo's] samurai followers were defeated by imperial troops, drawn from the peasantry and equipped with modern arms."  (Zwick Dec., ¶ 29 & Ex. R.)

- *The Works Have Identical Titles.*  Although Plaintiffs point out that the works have identical titles ("The Last Samurai"), that title was handed down by history, not conceived by either Plaintiffs or Defendants.  There is simply no dispute that Saigo Takamori has been known through history as the "Last Samurai."  (Zwick Dec., ¶¶ 15, 27 & Ex. P; Marquart Dec., Ex. G.)  And, even putting aside that historical fact, no party may claim a copyright in the title of a work.  See Chase-Riboud v. DreamWorks, Inc., 987 F. Supp. 1222, 1231 (C.D. Cal. 1997) ("[T]itles may not claim statutory copyright.") (*quoting* Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc., 109 F.3d 1394, 1399 (9th Cir. 1997)); see also 1 M. Nimmer & D. Nimmer, NIMMER ON COPYRIGHT § 2.16, pp. 2-185 to 2-186 (2007) ("It is nevertheless clear … that titles may not claim statutory copyright.").

- *The Settings are Identical*.  All of Plaintiffs' claimed identical settings – the Imperial Palace, the Imperial training field, multiple battles in foggy forests, the samurai retreat – are ***required*** in any story about a Western military advisor to the Emperor who trains an army to confront the samurai.  The doctrines of scènes à faire and merger bar Plaintiffs from claiming a monopoly on this kind of expression.

- *The Sequencing is Identical*.  The only identity of sequence alleged by Plaintiffs flows naturally from the historical record:  Western military advisor arrives in Japan, suffers initial setbacks, and participates in a climactic battle.  That is merely a repetition of the basic three-act structure required of any such tale; the timing of events is so obvious as to practically be required.

- *Each Work Has a War Profiteer*.  While each work has a minor character who is a gun manufacturer, there is simply no similarity between these two characters.  Plaintiffs' character is the meddling father-in-law of their

protagonist, whereas Defendants' character fires the protagonist in the opening scene and is never seen again.  Moreover, the war profiteer is a staple of cinema and fiction dealing with military subjects, such as in *Gone With the Wind* and *Catch-22*.

- *Each Work Begins with a Description of a Civil War Battle*.  This assertion is false (both works do not begin this way), but it goes without saying that almost every character has a back story that he or she reveals.  In a romance, the main characters disclose their past lovers; in a story about war, the main characters tell war stories.  These are basic plot devices that cannot be protected.  <u>See</u>, <u>e.g.</u>, <u>Denker v. Uhry</u>, 820 F. Supp. 722, 730 (S.D.N.Y. 1992) ("Plaintiff points out that each of the works opens with an 'accident' befalling the main character. … [A]t most plaintiff has alleged that [defendant] used a somewhat similar plot device to that employed in [his work], which does not constitute copyright infringement.").

- *Each Work Ends With the Protagonist Having An Audience with the Emperor, Recounting How Someone Died Courageously in Battle*.  This similarity flows naturally from the concept of a military advisor to the Emperor succeeding in battle.  Thus, at best, the Plaintiffs have identified a scène à faire.  The concept of the main character having an audience with his commander after a great battle is a stock plot idea that cannot be protected.  <u>See</u> <u>Cavalier</u>, 297 F.3d at 823 ("Familiar stock scenes and themes that are staples of literature are not protected."); <u>id.</u> at 824 ("[B]asic plot ideas . . . are not protected by copyright law.").  Indeed, the main character in a story nearly always has to report to his commander or to the head of state after the climactic battle has occurred (as, for example, when Luke Skywalker and Han Solo were commended by Princess Leia in the original *Star Wars*).  And, of course, the Emperor's posthumous honoring

of Saigo Takamori is an historical fact.  (Zwick Dec., ¶ 29 & Ex. R;

Marquart Dec., Exs. G, I & J.)

To summarize, all of these "similarities," to the extent they even exist, are not original plot contrivances that are subject to copyright protection.  Copyright provides protection in direct proportion to originality, and none of these concepts are original -- instead, they are history-based or generic.  Consequently, Defendants are entitled to summary judgment on Plaintiffs' First Claim for Relief.

## 2.   The works are clearly *dis*similar once the non-protectible elements are set to the side.

That Defendants are entitled to summary judgment is corroborated by the fact that, once the historical and generic elements of both screenplays are stripped away, the remaining aspects are clearly ***dis***similar.  Although both works begin with the same historical premise, they involve entirely different expressions.  "The extrinsic test focuses on 'articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events' in the two works."  Funky Films, 462 F.3d at 1077 (*quoting* Kouf, 16 F.3d at 1045 (citations omitted)).  Under any reasonable analysis each of these factors confirms that summary judgment in favor of Defendants is appropriate.

### (a)   Characters

*The Protagonists.*  Plaintiffs' Gamble and Defendants' Algren are two versions of the commonplace figure of the psychically or physically wounded veteran, but the circumstances of their back stories significantly differ.  Whereas Gamble accidentally killed his own men in the Battle of the Wilderness, Algren was compelled to participate in a brutal attack in the Indian Campaigns.  Gamble's back story is used to establish the debt he owes President Grant and thus to explain why he feels obliged to leave his comfortable life at West Point.  Later, when the memory of the Battle of the Wilderness returns in a Japanese opium den, it is used to reinforce Gamble's sense of failure after his son's murder, and his loss of half his

1   army while seeking revenge on the samurai.  By contrast, Algren's back story is

2   used to explain his instability and isolation, and later provides a foundation for his

3   ability to appreciate the samurai way of life (which parallels the Native American

4   way).

5      The protagonists also differ in background, circumstances, and experiences.

6   Gamble is a decorated veteran, a happy-go-lucky West Point professor and a family

7   man, whereas Algren is haunted and dissolute.  One of the opening scenes of

8   Plaintiffs' work depicts Gamble light-heartedly teasing military cadets as his class

9   ends, and then engaging in a snowball fight with them as he departs the building.

10   None of these character traits appear in Defendants' Algren -- who is depicted as an

11   abject failure and a loner drunk with a death wish.  (Zwick Dec., Ex. I at Chapter 2.)

12   The emotional trajectory of Plaintiffs' Gamble leads from the security of West Point

13   to defeat and despair – at his nadir he takes refuge in an opium den – after which he

14   regains his sense of honor and worth by killing the villain Saigo.  Algren's emotional

15   trajectory, by contrast, starts at a low point but leads to the healing of his psychic

16   wounds in the context of captivity, the regaining of his sense of honor fighting

17   alongside the samurai, and finally a return to the samurai village.  (Zwick Dec., Ex. I

18   at Chapters 11-18 & 30-40.)  Ultimately, Defendants' Algren comes to admire

19   everything that the samurai stood for, and therefore sides with them against the

20   newly westernized imperial army, using samurai tactics.  But Plaintiffs' Gamble

21   consistently views the samurai as vicious and corrupt (in fact, they kill his son), and

22   he defeats them using Western technology and tactics.  In short, the protagonists'

23   motivations and emotional journeys could not be more opposite.

24      *The Last Samurai Character.*  Plaintiffs' Saigo is a treacherous warlord who

25   betrays his allies and friends; his villainy appears to be motivated by an ambition to

26   become emperor.  By contrast, Defendants' Katsumoto is a thoughtful and spiritual

27   man – he is shown chanting in a Buddhist temple – respected by his friends and

28   enemies alike.  (Zwick Dec., Ex. I at Chapters 12 & 30.)  Although he is a fearsome

warrior, he is also well aware that his traditional way of life is coming to an end. Still, he wishes to preserve his dignity and honor. Although both chieftains are modeled on the historical Saigo Takamori, the parties' respective expressions of that individual are polar opposites.

*The Emperor Character.* Plaintiffs' Emperor is presented as an enlightened young ruler whose commitment to modernize Japan is shown, among other ways, by having him receive his advisors, including Saigo, at a Western-style table set with crystal and china, and announcing to them: "Gentlemen, welcome to the nineteenth century." (Marquart Dec., Ex. B at 18.) By contrast, Defendants' Emperor is a hesitant and tentative young man who is under the influence of an oligarch committed to modernization. At the film's conclusion, the Emperor comes into his own realization that Japan cannot forget its history and identity. (Zwick Dec., Ex. I at Chapter 39.)

*Other Characters.* Plaintiffs' Lord Eto is based on a historical figure, and has no parallel in Defendants' film, which portrays no independent samurai chieftains other than Katsumoto. Nor is there any parallel to the Plaintiffs' character Masako, the female samurai warrior, who assists Gamble in his revenge attack on Lord Saigo following the murder of Gamble's son. Other characters without analogue in *The Last Samurai* include: Gamble's wife, his son, and his domineering father-in-law; the Christian peasants Ken and Jun whose parents were killed by Eto and Saigo; and Gatier, the Frenchman killed by Saigo. Likewise, the Benay screenplay includes no parallel to Defendants' Colonel Bagley, who ordered the barbaric attack on a village during the Indian Campaigns; and no parallel to any of the characters from the samurai village, including the beautiful Taka, the movie's subdued love interest.

### (b) <u>Plot</u>

The plot of each work is similar only insofar as both involve the premise of an American soldier in Japan during the period of the Satsuma Rebellion. Plaintiffs' screenplay develops this premise into a story of revenge in which the American

protagonist moves from domestic security, to despair, and finally to revenge and triumph when he defeats his evil antagonist.  Defendants' film develops this premise in an entirely different way, turning it into a captivity narrative reminiscent in some respects to *Dances With Wolves* (Zwick Dec., Ex. I at Chapters 11-18); the American protagonist in Defendants' story moves from isolation and self-destructive cynicism to acceptance in a traditional community whose values he can embrace and to which he is willing to devote his life.  Plaintiffs' plot represents the leader of the samurai rebellion as a treacherous villain who is justly defeated by a heroic protagonist; Defendants' plot, on the other hand, represents the samurai leader as a figure of doomed nobility who leads the protagonist to enlightenment.  Furthermore, Defendants' film possesses nothing of the intrigue subplot concerning Saigo, Eto, and Maebara that is prominent in the Benay screenplay.  Accordingly, contrary to Plaintiffs' position, the *expressions* of the respective plot ideas could hardly be more different.  See, e.g., Litchfield, 736 F.2d at 1357 ("Any similarities in plot exist only at the general level for which plaintiff[s] cannot claim copyright protection."); see also Berkic, 761 F.2d at 1293 ("To some extent, both works take their general story from the adventures of a young professional who courageously investigates, and finally exposes, the criminal organization.  But this degree of similarity between the basic plots of two works cannot sustain a plaintiff's claim that the works are 'substantially similar.'").

### (c)   Themes

        When basic stock themes are set aside, the two works are not even of the same *type*.  The Benay screenplay is an action-based revenge story – Saigo is a classic villain who kills the Western protagonist's son.  In the climax, Gamble fights an epic battle with Saigo to avenge his son's death.  In *The Last Samurai*, Algren develops a deep and enduring friendship and respect for the Saigo-based character and his dying culture, ultimately joining him in battle in the climactic moments of the film.  (Zwick Dec., Ex. I at Chapters 30-38.)  In short, one movie is a

swashbuckling revenge movie, and the other is a redemptive buddy movie.  <u>See also</u>
<u>Anderson v. Paramount Pictures Corp.</u>, 617 F. Supp. 1, 2 (C.D. Cal. 1985) (finding
no substantial similarity where moods of two works were dissimilar:  one was a
"social comedy" and the other a "romantic melodrama").

### (d)   <u>Setting</u>

Setting is employed in fundamentally different ways in the two works.
Plaintiffs' screenplay uses setting for variety and exoticism as do, for example, many
James Bond movies.  Thus, the Plaintiffs employ sea fights as well as land fights,
and exotic locales such as the opium den and the temple of the warrior monks.
Defendants' work, on the other hand, employs setting structurally and thematically.
Thus, a major contrast is established between the urban and village settings as
representations of the opposed value systems of the modern and traditional worlds.
The story moves from urban Japan to the village for the captivity sequence, then
back to the city, and after the climactic battle, back to the village.  No such pattern
appears in the Benay screenplay.

### (e)   <u>Mood</u>

There is a clear difference in tone between the works in question.  Plaintiffs'
screenplay is predominantly triumphal or exultant.  This quality is apparent, for
example, in the Iwo Jima finale in which Gamble, having slain Saigo, takes out the
American flag he has been carrying, explains to a young Japanese soldier that the
flag is a symbol of freedom, and then raises the stars and stripes on the Iwo Jima
mountain peak in a foreshadowing of the U.S. victory in World War II.
Defendants' *The Last Samurai*, on the other hand, is predominantly nostalgic and
reflective.  This quality is evident in, for example, the dreamy concluding sequence
in which Algren returns to the Japanese village and effectively turns his back on
America.  The generally melancholy tone of the movie is related to the fact that this
work celebrates a way of life that even its proponents realize is doomed.

### (f)   Pace

The Benay screenplay is a fast-paced adventure and intrigue story.  While Defendants' film also employs fast-paced action sequences, it also includes the more leisurely sequence in which Algren, a captive and guest in the samurai village, comes to appreciate the traditional Japanese way of life.  (Zwick Dec., Ex. I at Chapters 11-18.)  That both works, like countless Hollywood movies, happen to employ fast-paced action sequences is not a substantial similarity.

### (g)   Sequence of Events

The sequence of events in each work is similar only at the highest level of abstraction; when describing two works on similar subjects it is possible to leave out so much particularity of character and event that little is left but commonplaces and scènes à faire.  In the present case, a description of the general sequence of events at a high level of abstraction leaves out such obvious and crucial differences between the works as:

- The Benay screenplay is a story of deception and intrigue in which a hero triumphs over a treacherous villain.  Defendants' story, on the other hand, is a captivity narrative in which the hero undergoes a transformation and a radical change of life.  (Zwick Dec., Ex. I at Chapters 11-18.)

- In the Benay screenplay, despite the hero's warning, the initial battle ends with the imperial army's victory and with Gamble presenting Lord Eto's head to the Emperor.  Despite his protests that the recruits are raw and insufficiently trained, Gamble's tactical brilliance allows him to defeat his enemy.  In the Defendants' work, on the other hand, the initial battle ends with the rout of the raw imperial army and Algren's capture.  (Zwick Dec., Ex. I at Chapters 8-9.)

- In the Benay screenplay, the "picture of Japan" that Gamble acquires is an understanding of the brutality and deceit of the samurai.  Gamble's

1   very different story ends where it began, in New York.  The signs of

2   change are Japanese house furnishings and a daughter named Masako.

3   In the Defendants' work, by contrast, Algren acquires a deep

4   appreciation for the traditional values of the samurai and ultimately

5   elects to remain in Japan among them.

6   In short, "[t]he stories do not share any detailed sequence of events."  <u>Cavalier</u>, 297

7   F.3d at 824.

8                              **(h)     <u>Dialogue</u>**

9          There are notable differences in the approach to dialogue in the two works.

10   With the exception of a few brief words or phrases, the Benay screenplay is written

11   in English; Defendants' film, by contrast, includes substantial exchanges in

12   Japanese.  Defendants' film also uses voice-over passages to suggest that Algren is

13   keeping a journal of his experiences in Japan, one that continues his journal of the

14   Indian Campaigns.  (*E.g.*, Zwick Dec., Ex. I at Chapter 4.)  Nothing like this appears

15   in the Benay screenplay.

16          There are no passages in *The Last Samurai* that are in any substantial way

17   similar to passages in the Benay Screenplay.  Nor have the Plaintiffs even attempted

18   to identify any dialogue "similarities."  <u>See</u>, <u>e.g.</u>, <u>Kouf</u>, 16 F.3d at 1046 (affirming

19   summary judgment where "dialogues [were] similar in random words, at best");

20   <u>Olson v. Nat'l Broadcasting Co.</u>, 855 F.2d 1446, 1450 (9th Cir. 1988) (affirming

21   summary judgment where plaintiff did not demonstrate "extended similarity of

22   dialogue"); <u>Idema v. DreamWorks, Inc.</u>, 162 F. Supp. 2d 1129, 1185 n.67 (C.D. Cal.

23   2001) ("Plaintiffs again confuse the 'idea' conveyed by a particular piece of dialogue

24   with the protectable 'expression' thereof.").

25

26

27

28

**II.   <u>SUMMARY JUDGMENT SHOULD BE ENTERED IN FAVOR OF
ALL DEFENDANTS AND AGAINST PLAINTIFFS ON THEIR
CLAIM FOR BREACH OF IMPLIED CONTRACT</u>**

Plaintiffs' Second Claim for Relief alleges that Defendants breached an
implied-in-fact contract that "obligated" them to pay for the alleged use of the
Benay screenplay.  "To establish an implied-in-fact contract, the plaintiff must
show:  that he or she prepared the work; that he or she disclosed the work to an
offeree for sale; that under all circumstances attending disclosure it can be
concluded that the offeree voluntarily accepted the disclosure knowing the
conditions on which it was tendered (i.e., the offeree must have the opportunity to
reject the attempted disclosure if the conditions were unacceptable); and the
reasonable value of the work."  <u>Klekas v. EMI Films, Inc.</u>, 150 Cal. App. 3d 1102,
1114, 198 Cal. Rptr. 296 (1984) (citing, *inter alia*, <u>Desny v. Wilder</u>, 46 Cal.2d 715,
744, 299 P.2d 257 (1956)).

On their Second Claim for Relief, the Plaintiffs may recover, if at all, only for
the alleged theft of their ideas, not for the alleged copying of their screenplay, which
would be preempted by the Copyright Act.  <u>See</u>, *e.g.*, <u>Grosso v. Miramax Film
Corp.</u>, 383 F.3d 965, 967-68 (9th Cir. 2004).  Yet, the Plaintiffs cannot prove that
the Defendants used their ideas when developing *The Last Samurai*.  <u>See</u> <u>Klekas</u>,
150 Cal. App. 3d at 1115 ("Although plaintiff may have submitted his literary effort
to one of the named defendants, there is nothing in the record to establish the use of
that work in the writing or making of 'The Deer Hunter.'").  As discussed in
Section I.A., above, there is no admissible evidence to rebut the fact that Zwick and
Logan independently created the essential elements for what became *The Last
Samurai* well before any alleged access to the Benay screenplay.  Thus, any
inference of Defendants' use based on the fact that the two works share a similar
premise is dispelled *as a matter of law*.  <u>See</u> <u>Hollywood Screentest of Am., Inc. v.
NBC Universal, Inc.</u>, 151 Cal. App. 4th 631, 646, 60 Cal. Rptr. 3d 279 (2007).

1    Plaintiffs speculate that Zwick and Logan incorporated their ideas into the

2  screenplay for *The Last Samurai*.  However, Defendants' evidence of independent

3  creation cannot be contradicted by "'suspicion alone, or ... [by] imagination,

4  speculation, supposition, surmise, conjecture, or guesswork.'"  Id. at 648 (*quoting*

5  Mann v. Columbia Pictures, Inc., 128 Cal. App. 3d 628, 648 & 650-51, 180 Cal.

6  Rptr. 522 (1982)).  Indeed, evidence of suspicious "similarities and timing are

7  insufficient to create a disputed issue of fact."  Id.  Yet, that is the only "evidence"

8  on the subject that the Plaintiffs possess.  Accordingly, Defendants respectfully

9  request that the Court enter summary judgment against the Second Claim for Relief,

10  in its entirety.  See id. at 649 ("Because NBC has presented undisputed evidence of

11  independent creation, thus preventing a finding of use, none of appellants' causes of

12  action can survive.").

13                                  **Conclusion**

14    Defendants respectfully request that the Court enter summary judgment in

15  their favor and against the Plaintiffs on the First Amended Complaint and all claims

16  for relief alleged therein

17

18  DATED:  January 11, 2008          QUINN EMANUEL URQUHART OLIVER &
                                       HEDGES LLP
19
20                                     BAKER MARQUART CRONE &
                                       HAWXHURST LLP
21
22                                     By___/s/ George R. Hedges_____
                                         George R. Hedges
23                                       Attorneys for Defendants Warner Bros.
                                         Entertainment, Inc., Radar Pictures, Inc.,
24                                       Bedford Falls Company (erroneously sued as
                                         Bedford Falls Productions, Inc.), Edward
25                                       Zwick, Marshall Herskovitz and John Logan

26

27

28