DANIEL PETROCELLI (S.B. #97802)
dpetrocelli@omm.com
JAMES M. PEARL (S.B. #198481)
jpearl@omm.com
BRIAN FINKELSTEIN (S.B. #261000)
brianfinkelstein@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA  90067-6035
Telephone:   (310) 553-6700
Facsimile:   (310) 246-6779

Attorneys for Defendants
WARNER BROS. ENTERTAINMENT,
INC. and JOHN LOGAN

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AARON BENAY,  *et al.*, | Case No.  CV05-8508 PSG (FMOx) |
| Plaintiffs, | **DEFENDANTS WARNER BROS. ENTERTAINMENT INC. AND JOHN LOGAN'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| WARNER BROS. ENTERTAINMENT, INC., *et al.*, | |
| Defendants | Hearing Date:  February 6, 2012 |
| | Time:              1:30 p.m. |
| | Place:             Courtroom 880 |
| | Judge:            Hon. Philip S. Gutierrez |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** on February 6, 2012, at 1:30 p.m., or as soon thereafter as the matter may be heard, before the Honorable Philip S. Gutierrez, United State District Court Judge, in Courtroom No. 880 in the Edward R. Roybal Building, 255 East Temple Street, Los Angeles, California, 90012, defendants Warner Bros. Entertainment, Inc. ("Warner Bros.") and John Logan will and hereby do move this Court for an order pursuant to Federal Rule of Civil Procedure 56(a) and Local Rules 56-1 and 56-3 for summary judgment against plaintiffs Aaron Benay and Matthew Benay (collectively, "Plaintiffs") on Plaintiffs' only remaining cause of action:  breach of implied-in-fact contract.

This motion is made on the grounds that Plaintiffs' breach of implied-in-fact contract claim fails as a matter of law because there was no privity of contract between Warner Bros. and Plaintiffs, or between Mr. Logan and Plaintiffs, sufficient to form the basis for an implied-in-fact contract.  The following facts are not in genuine dispute, and support summary judgment:  (1) neither Plaintiffs, Plaintiffs' literary agent David Phillips, nor anyone acting on Plaintiffs' behalf discussed the Plaintiffs' screenplay (the "Benay Script") with Warner Bros. or Mr. Logan; (2) neither Plaintiffs, Mr. Phillips, nor anyone acting on Plaintiffs' behalf submitted the Benay Script to Warner Bros. or Mr. Logan and neither Warner Bros. nor Mr. Logan received a copy of the Benay Script prior to when *The Last Samurai* was in development.  With these undisputed facts, there can be no privity.  Without privity, Plaintiffs' sole remaining claim must be dismissed.  *See Benay v. Warner Bros. Entm't, Inc.*, 607 F.3d 620, 634 (9th Cir. 2010).

This motion is based upon this Notice of Motion and Motion, the attached memorandum of points and authorities, the declarations and other evidence filed concurrently herewith, the Separate Statement of Uncontroverted Facts and Conclusions of Law, the pleadings and records on file in this action, and on such other and further evidence as the Court may consider at or before the hearing.  This

MOTION FOR SUMMARY JUDGMENT
CV05-8508 PSG (FMOX)

1   motion is made following the conference of counsel pursuant to Local Rule 7-3 and

2   Judge Gutierrez's Standing Order Regarding Newly Assigned Cases ¶ 5(b) which

3   took place on October 9, October 12, and October 27.

4

5   Dated:        December 2, 2011        O'MELVENY & MYERS LLP

6

7                                        By:_____

8                                             Daniel Petrocelli

9                                        Attorneys for Defendants Warner
                                         Bros. Entertainment, Inc. and John
10                                       Logan

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MOTION FOR SUMMARY JUDGMENT
CV05-8508 PSG (FMOX)

1

**TABLE OF CONTENTS**

2

**Page**

3    I.      INTRODUCTION ..................................................................................... 1

4    II.     SUMMARY OF UNCONTESTED FACTS ............................................. 3

5            A.    The Benay Script Pitch and Submission ................................. 3

6            B.    The Independent Production Companies ................................ 4

              1.    Bedford Falls and Rick Solomon ................................ 4

7             2.    Silver Pictures and Dan Cracchiolo ........................... 4

8    III.    SUMMARY JUDGMENT STANDARD ................................................. 5

9    IV.     THE COURT SHOULD EXCLUDE PLAINTIFFS' NEW THEORY
             OF AGENCY ......................................................................................... 5

10   V.      PLAINTIFFS WERE NOT IN PRIVITY OF CONTRACT WITH
             WARNER BROS. OR MR. LOGAN ...................................................... 8

11           A.    Plaintiffs Have No Admissible Evidence of Privity ............... 8

12            1.    No Direct Submission to Warner Bros ........................ 8

13            2.    No Admissible Evidence of Indirect Submission to
                   Warner Bros ............................................................... 9

              3.    Plaintiffs Cannot Authenticate Anonymous Documents of
14                 Suspicious Origin ..................................................... 15

15           B.    Plaintiffs Cannot Prove Mr. Cracchiolo Was Warner Bros.'
                   Agent ................................................................................. 18

16            1.    Actual Authority ...................................................... 18

17            2.    Apparent Authority ................................................... 18

             C.    Plaintiffs Cannot Prove Mr. Cracchiolo Submitted the Benay
18                 Script to Warner Bros. as Plaintiffs' Agent ........................ 22

19           D.    Plaintiffs Are Not In Privity of Contract With Mr. Logan ................ 23

     VI.     EVEN IF PLAINTIFFS COULD ESTABLISH PRIVITY, THEY
20           STILL CANNOT PROVE AN IMPLIED-IN-FACT CONTRACT ........... 23

21   VII.    CONCLUSION ....................................................................................... 24

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

CASES

*Alexander Dawson, Inc. v. N.L.R.B.,*
    586 F.2d 1300 (9th Cir. 1978)..................................................... 15

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) ...................................................................... 5

*Ashcroft v. Iqbal,*
    129 S. Ct. 1937 (2009) ................................................................... 6

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ....................................................................... 6

*Benay v. Warner Bros. Entm't, Inc.,*
    607 F.3d 620 (9th Cir. 2010) ............................................ 1, 5, 8, 23

*Burgess v. Premier Corp.,*
    727 F.2d 826 (9th Cir. 1984) ...................................................... 15

*Can. v. Blain's Helicopters, Inc.,*
    831 F.2d 920 (9th Cir. 1987) ....................................................... 11

*Cassese v. Fox Broad. Co.,*
    No. B217655, 2010 WL 3129527 (Cal. Ct. App. Aug. 10, 2010) ........................ 22

*Cavicchia v. Philadelphia Hous. Auth.,*
    2003 WL 22595210 (E.D. Pa. Nov. 7, 2003),
    *aff'd,* 137 Fed. Appx. 495, 496 (3rd Cir. 2005)........................................... 17

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ....................................................................... 5

*Chandler v. Roach,*
    156 Cal. App. 2d 435 (1957) ................................................... 8, 23

*Desny v. Wilder,*
    46 Cal. 2d 715 (1956)................................................................... 24

*Dill v. Berquist Constr. Co., Inc.,*
    24 Cal. App. 4th 1426 (1994)...................................................... 20

*Donahue v. Ziv Television Programs, Inc.,*
    245 Cal. App. 2d 593 (1966)................................................. 19, 23

*Grosso v. Miramax Film Corp.,*
    No. B193872, 2007 WL 2585053 (Cal. App. 2 Dist. Sept. 10, 2007)........... 17, 23

*J.L. v. Children's Inst., Inc.,*
    177 Cal. App. 4th 388 (2009)................................................... 8, 19

MOTION FOR SUMMARY JUDGMENT
CV05-8508 PSG (FMOX)

*Kluge v. Fugazy*,
739 F. Supp. 939 (S.D.N.Y. 1990)........................................................................ 14

*Mann v. Columbia Pictures, Inc.*,
128 Cal. App. 3d 628 (1982)............................................................... 19, 20, 23, 24

*McCullough v. Lennar Corp.*,
No. 09cv1808-AJB(NLS), 2011 WL 1585017 (S.D. Cal. Apr. 26, 2011) .......... 20

*O'Riordan v. Fed. Kemper Life Assurance*,
36 Cal. 4th 281 (2005) ........................................................................................ 22

*Orr v. Bank of Am.*,
285 F.3d 764 (9th Cir. 2002)................................................................... 10, 16, 23

*Rokos v. Peck*,
182 Cal. App. 3d 604 (1986).......................................................................... 8, 23

*S. Sacramento Drayage Co. v. Campbell Soup Co.*,
220 Cal. App. 2d 851 (1963)................................................................................ 22

*U.S. v. Black*,
767 F.2d 1334 (9th Cir. 1985)............................................................................. 15

*U.S. v. Blaylock*,
20 F.3d 1458 (9th Cir. 1994)............................................................................... 11

*U.S. v. De Gudino*,
722 F.2d 1351 (7th Cir. 1983)............................................................................. 16

*U.S. v. Dreer*,
740 F.2d 18 (11th Cir. 1984)............................................................................... 14

*U.S. v. Dumeisi*,
424 F.3d 566 (7th Cir. 2005)............................................................................... 15

*U.S. v. Safavian*,
435 F. Supp. 2d 36 (D.D.C. 2006) ...................................................................... 16

*U.S. v. Vidacak*,
553 F.3d 344 (4th Cir. 2009)............................................................................... 16

*U.S. v. Wilson*,
532 F.2d 641 (8th Cir. 1976)......................................................................... 16, 17

*Walker v. T-Mobile USA*,
298 Fed. Appx. 665 (9th Cir. 2008) ...................................................................... 6

**STATUTES**

CAL. CIV. CODE § 2299 .......................................................................................... 18

CAL. CIV. CODE § 2300 .......................................................................................... 18

1

CAL. CIV. CODE § 2332 ................................................................................ 22

2

**OTHER AUTHORITIES**

3

4 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT §
   19.05[C] (2011) (hereinafter "NIMMER") .................................................... 8, 23

4

5 WEINSTEIN'S EVIDENCE § 900.06[1][a] ...................................................... 11

5

6

FED. R. CIV. P. 37(c)(1) ................................................................................. 6

7

FED. R. CIV. PROC. 12(c) ............................................................................... 6

8

FED. R. CIV. PROC. 26(e) ............................................................................... 7

9

FED. R. CIV. PROC. 56(c), (e) ...................................................................... 11

10

FED. R. EVID. 801 ........................................................................................ 10

11

FED. R. EVID. 901 ........................................................................................ 11

12

Fed. R. Evid. 901(b)(3), (b)(4) .................................................................... 15

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MOTION FOR SUMMARY JUDGMENT
CV05-8508 PSG (FMOX)

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Plaintiffs Aaron Benay and Matthew Benay (the "Plaintiffs") filed this suit in 2005 alleging that the script for the motion picture entitled *The Last Samurai* was copied from Plaintiffs' screenplay (the "Benay Script").  In 2008, this Court dismissed Plaintiffs' claims for copyright infringement, breach of implied-in-fact contract, and intentional interference with prospective economic advantage.  On appeal, the Ninth Circuit affirmed the dismissal of the copyright infringement claim and reversed and remanded on the breach of implied-in-fact contract claim. (Plaintiffs did not appeal from the dismissal of the interference claim.)  *See Benay v. Warner Bros. Entm't, Inc.*, 607 F.3d 620, 622 (9th Cir. 2010).  The Ninth Circuit specifically left open for resolution by the District Court whether Plaintiffs could prove privity of contract, an essential element of an implied-in-fact contract claim. *Id.* at 634.

Such a showing is impossible here.  Plaintiffs have not even pled a theory of privity with Warner Bros. Entertainment, Inc. ("Warner Bros.") or John Logan (collectively, the "Moving Defendants").  In addition, Plaintiffs concede neither they nor their literary agent, David Phillips, ever spoke to the Moving Defendants about the Benay Script or submitted it to them.  Faced with the undisputed absence of any direct privity with Moving Defendants, Plaintiffs have now turned to theories of agency in an effort to prove privity.  Their theories and efforts are wholly unavailing.

Though never pled or articulated in their discovery responses, Plaintiffs apparently will contend that Mr. Phillips mailed the Benay Script to a man named Dan Cracchiolo, a former employee of Silver Pictures Management, Inc. ("Silver Management") which worked with Silver Pictures, Inc. (collectively with Silver Management, "Silver Pictures"), an independent production company located on the Warner Bros. studio lot.  Mr. Cracchiolo passed away in 2004, a year before this

1   lawsuit was filed.  SS ¶ 36.  Plaintiffs claim alternatively—and inconsistently—that

2   Mr. Cracchiolo acted either as an agent for Warner Bros. or the Benays in

3   purportedly receiving a copy of the Benay Script in the mail, providing it to Warner

4   Bros., and later advising Mr. Phillips that Warner Bros. decided to pass on the

5   script.  This last-ditch assertion is demonstrably false and fails for a number of

6   independent reasons.

7       First, Plaintiffs' initial complaint contains no allegation or mention that

8   Mr. Cracchiolo acted as an agent for Warner Bros. or Mr. Logan.  The same is true

9   for Plaintiffs' first amended complaint (the operative pleading) as well as their

10  interrogatory answers and original deposition testimony.  It was not until July of

11  this year when Plaintiffs' were briefly deposed again that it first became apparent

12  they would attempt to use the late Mr. Cracchiolo as their "missing" privity link—

13  six years after this litigation started, long after discovery had closed, only when

14  Plaintiffs' other claims had been dismissed, and only after Mr. Cracchiolo died

15  without ever having an opportunity to respond to or be examined about Plaintiffs'

16  assertions.  Moving Defendants have been irremediably prejudiced by Plaintiffs'

17  inexcusable delay in asserting this new claim.

18      Second, agency aside, Plaintiffs have *no* admissible evidence that Warner

19  Bros. ever received the Benay Script from Mr. Cracchiolo or anyone else.

20  Plaintiffs' rely solely on the testimony of Mr. Phillips who claims to have spoken

21  with Mr. Cracchiolo.  Such testimony to prove the truth of the matter asserted is

22  rank hearsay of the worst kind, especially given Mr. Cracchiolo's unavailability.

23      Third, Plaintiffs cannot prove agency.  Mr. Cracchiolo never was employed

24  by Warner Bros. or Mr. Logan or otherwise authorized to act on their behalves.

25  Plaintiffs have no contrary evidence.  Nor can they establish apparent agency.

26  Plaintiffs knew Mr. Cracchiolo was an employee of Silver Pictures, not Warner

27  Bros.  They can point to no conduct by Warner Bros. remotely establishing that it

28  led third parties to reasonably believe that Mr. Cracchiolo was authorized to act on

its behalf.  Mr. Phillips admitted in deposition that he mailed the Benay Script to over *30 producers*, one or two of which happened to be located on the Warner Bros. lot.  Even accepting this testimony, a mass mailing of this type does not create privity, let alone bind Warner Bros. to a contract with individuals they never met regarding a script they never sought or reviewed on terms that were never discussed.

Fourth, Plaintiffs have no evidence supporting their contradictory, fallback argument that Mr. Cracchiolo acted as *their* agent in receiving the Benay Script and conveying it to Warner Bros., nor was this claim ever pled or mentioned in Plaintiffs' discovery responses.  To the contrary, in response to an interrogatory asking Plaintiffs to disclose all persons who pitched their screenplay to any of the defendants, Plaintiffs identified only Mr. Phillips.  Furthermore, Plaintiffs have no admissible evidence that Mr. Cracchiolo agreed to act as Plaintiffs' agent, provided the Benay Script to anyone in such capacity, or was authorized to bind Plaintiffs' with respect to their script.

Fifth, Plaintiffs have no evidence to prove privity of contract with Mr. Logan.  They have not even ventured a theory as to Mr. Logan.

Finally, even assuming Plaintiffs could somehow show privity with Warner Bros. or Mr. Logan, they still cannot prove the requirements for an implied-in-fact contract.

In sum, Plaintiffs' remaining contract claim presents no triable issue of fact and summary judgment therefore should be granted.

## II.   SUMMARY OF UNCONTESTED FACTS

### A.   The Benay Script Pitch and Submission

In early 2000, Plaintiffs completed a draft of the Benay Script and engaged a literary agent—Mr. Phillips of the Writers & Artists Agency—to sell it.  Separate Statement of Uncontroverted Facts and Conclusions of Law (hereinafter "SS") ¶¶ 1, 2.  Plaintiffs allege that on May 9, 2000, Mr. Phillips pitched and subsequently

MOTION FOR SUMMARY JUDGMENT
CV05-8508 PSG (FMOX)

1   submitted the Benay Script to numerous independent production companies,

2   including to Rick Solomon, President of defendant The Bedford Falls Company

3   ("Bedford Falls").  SS ¶ 8.  In their recent deposition testimony this year, Plaintiffs

4   claimed for the first time that Mr. Phillips also submitted the Benay Script to

5   Mr. Cracchiolo at Silver Pictures.  SS ¶¶ 43, 44, 62.  Even so, it remains undisputed

6   that neither Plaintiffs nor Mr. Phillips ever pitched or submitted the Benay Script

7   directly to Warner Bros. or Mr. Logan.[1]  SS ¶¶ 9, 10.

8                   **B.      The Independent Production Companies**

9                       **1.      Bedford Falls and Rick Solomon**

10      Bedford Falls is an independent film production company headed by

11   defendants Ed Zwick and Marshall Herskovitz.  SS ¶ 12.  It produces films and

12   partners with movie studios to release and distribute them.  SS ¶ 13.  Bedford Falls

13   has produced numerous critically and commercially successful films such as *The*

14   *Player*, *Shakespeare in Love, Traffic*, and *Blood Diamond*.  In May 2000, Bedford

15   Falls had no contractual relationship with Warner Bros. or Mr. Logan.  SS ¶ 18.

16                      **2.      Silver Pictures and Dan Cracchiolo**

17      Silver Pictures is another independent film production company, founded and

18   headed by producer Joel Silver.  SS ¶ 19.  In May 2000, Silver Pictures had a

19   contract with Warner Bros. (the "WB-Silver Agreement") providing Silver Pictures

20   would "first submit exclusively to [Warner Bros.] each [film proposal] which . . .

21   Silver desires to develop or produce," and that "[w]ithin ten (10) business days after

22   [Silver Pictures]'s submission, [Warner Bros.] shall either approve or reject [Silver

23   Pictures]'s submission."  SS ¶ 20.  Warner Bros. had absolute authority to accept or

24   reject any submission from Silver Pictures.  SS ¶ 21.  The WB-Silver Agreement

25   did not authorize Silver Pictures to enter into agreements or undertake any actions

26   _____

27      [1] Plaintiffs also testified Mr. Phillips sent a copy of their script to Courtenay
Valenti, an executive at Warner Bros., as a writing sample in 2003 or 2004.  That
occurred around the time *The Last Samurai* was released (December 2003), long

28   after development of the Zwick/Logan Script in early 2000.  SS ¶ 11.

-4-                    MOTION FOR SUMMARY JUDGMENT
CV05-8508 PSG (FMOX)

1    on behalf of Warner Bros.  SS ¶ 23.

2          In May 2000, Silver Pictures was located on the Warner Bros. studio lot—a

3    common arrangement in the entertainment industry.  SS ¶¶ 24, 25.  In fact, at the

4    time, over 25 independent film production companies and 75 independent

5    television production companies were located on the Warner Bros. studio lot.  SS

6    ¶ 26.  Mr. Cracchiolo was an employee of Silver Pictures.  SS ¶¶ 28.  At his

7    deposition this year, Mr. Phillips described his prior interactions with

8    Mr. Cracchiolo and acknowledged that Mr. Cracchiolo rarely received script

9    submissions since he "wasn't a development guy."  SS ¶ 31.  As Mr. Phillips

10   recounted, on the rare occasions he sent Mr. Cracchiolo a submission, (i)

11   Mr. Phillips would evaluate it; (ii) if he liked it, he would confer with Joel Silver

12   about taking it to Warner Bros.; (iii) he would ask Mr. Phillips' permission to send

13   it to Warner Bros.; (iv) if permission were given, he would pitch it to Warner Bros;

14   and (v) Warner Bros. would then decide if it had any interest in the submission.  SS

15   ¶ 32.

16   **III.   SUMMARY JUDGMENT STANDARD**

17          Among other elements of their implied-in-fact contract claim, Plaintiffs must

18   show they were in privity of contract with Moving Defendants.  *See Benay*, 607

19   F.3d at 634.  If there is no genuine issue of material fact as to privity of contract,

20   Moving Defendants are entitled to summary judgment.  *See Celotex Corp. v.*

21   *Catrett*, 477 U.S. 317, 322 (1986).  Moving Defendants need not prove there is

22   "literally no evidence" supporting Plaintiffs' claim (although that is the case here),

23   only that there is insufficient evidence for a jury to find in Plaintiffs' favor.  *See*

24   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).

25   **IV.   THE COURT SHOULD EXCLUDE PLAINTIFFS' NEW THEORY OF**

26   **AGENCY.**

27          Plaintiffs commenced this lawsuit in 2005.  SS ¶ 40.  Until recently, they

28   never once explained in any pleading, interrogatory response, or deposition

MOTION FOR SUMMARY JUDGMENT
CV05-8508 PSG (FMOX)

1   testimony how Warner Bros. or Mr. Logan could be held liable for breach of

2   implied-in-fact contract.  SS ¶ 41.  Only in 2011, eight years after release of *The*

3   *Last Samurai*, six years after filing suit, and after the Ninth Circuit affirmed

4   dismissal of their other claims, did Plaintiffs first surface Mr. Cracchiolo's name

5   and their theory that he acted as an agent of either Warner Bros. or the Benays.[2]  SS

6   ¶ 62, 63.  This not only casts grave doubt about the probability of Plaintiffs' claim,

7   it is cause to exclude it altogether.

8        First, Plaintiffs' first amended complaint does not so much as mention

9   Mr. Cracchiolo or Silver Pictures.  SS ¶¶ 42, 43.  Plaintiffs' failure to plead any

10  facts suggesting they entered into an implied-in-fact contract with Warner Bros. or

11  Mr. Logan, either directly or through an actual or apparent agent, is grounds for

12  dismissal.  *See* FED. R. CIV. PROC. 12(c); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

13  555-56 (2007) (a complaint must give the defendant "fair notice of what the . . .

14  claim is and the grounds upon which it rests," including sufficient factual

15  allegations); *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009).  Plaintiffs had

16  more than ample opportunity in the ensuing six years to disclose their latest theory,

17  but did not.  Mr. Cracchiolo's name appeared nowhere in the Plaintiffs' initial

18  depositions, Mr. Phillips' 2007 declaration, or Plaintiffs' interrogatory responses.

19  SS ¶¶ 43, 44.  When Matthew Benay was specifically asked at deposition in 2007

20  what evidence he had that Warner Bros. knew of the alleged use of the Benay

21  Script, he cryptically replied:  "That is a conversation I had with my attorney."  SS

22  ¶ 64.  This, he confirmed, was the *only* basis for the allegation.  SS ¶ 64.

23       Second, Plaintiffs' failure to identify Mr. Cracchiolo in their interrogatory

24  responses and their systematic failure to supplement their answers are also grounds

25  to exclude all evidence related to Mr. Cracchiolo.  *See* FED. R. CIV. P. 37(c)(1);

26  *Walker v. T-Mobile USA*, 298 Fed. Appx. 665, 667 (9th Cir. 2008) (holding district

27

28       [2] Plaintiffs have not claimed that Mr. Cracchiolo was Mr. Logan's agent or that he pitched the script to Mr. Logan.  SS ¶ 65.

1    court did not abuse its discretion in excluding affidavits from two witnesses
2    plaintiff failed to identify in response to defendant's interrogatories).  In response to
3    defendants' 2007 interrogatories asking Plaintiffs to identify all producers to whom
4    Mr. Phillips pitched the Benay Script, Plaintiffs said nothing about Mr. Cracchiolo
5    or Silver Pictures.  SS ¶ 44.  At their recent depositions, both brothers claimed this
6    omission was an "oversight."  SS ¶ 45.  Matthew Benay cavalierly answered:  "Are
7    [the interrogatory responses] full and complete?  Apparently they're not."[3]  SS ¶ 48.
8    Likewise, with respect to Plaintiffs' contradictory assertion that Mr. Cracchiolo was
9    *their* agent, when asked in the same 2007 interrogatories to "[i]dentify all persons
10   who pitched your screen play to any defendant," Plaintiffs named only Mr.
11   Phillips—again, they did not identify Mr. Cracchiolo.  SS ¶ 66.  Indeed, even after
12   having acknowledged their interrogatory responses were inaccurate and been
13   reminded of their obligation to supplement (SS ¶ 46), and even after their own
14   attorney agreed that "[a] party is under a duty to seasonably amend prior responses"
15   (SS ¶ 49), Plaintiffs still have failed to "supplement or correct" their responses (SS
16   ¶ 67).  *See* FED. R. CIV. PROC. 26(e).

17          Plaintiffs' longstanding failure to identify Mr. Cracchiolo has severely
18   prejudiced Moving Defendants by preventing them from investigating the
19   purported actions of Mr. Cracchiolo or Silver Pictures and the alleged agency
20   theories during the principal discovery phase of this case.  Investigation during the
21   reopened discovery period was limited in time and scope (*e.g.*, depositions were
22   limited to four hours, no document requests, no written discovery regarding this
23   new theory, etc.).  SS ¶ 47.  For these reasons, all evidence related to
24   Mr. Cracchiolo and Plaintiffs' new claims of agency should be excluded.

25

26

27          [3] In his subsequent errata, Matthew Benay changed his testimony from
28   "Apparently they're not" to "We believe we answered completely at the time, and
     any omission is an oversight."

MOTION FOR SUMMARY JUDGMENT
CV05-8508 PSG (FMOX)

## V.   PLAINTIFFS WERE NOT IN PRIVITY OF CONTRACT WITH WARNER BROS. OR MR. LOGAN.

As the Ninth Circuit held in this case, "[p]rivity between the parties is a necessary element of an implied-in-fact contract claim." *Benay v. Warner Bros. Entm't, Inc.*, 607 F.3d 620, 634 (9th Cir. 2010); *accord Rokos v. Peck*, 182 Cal. App. 3d 604, 617-18 (1986) ("[T]he creation of an implied-in-fact contract between an author, on the one hand, and an agent, producer, or director, on the other hand, is of such a personal nature that it is effective only between the contracting parties. . . .  A cause of action for breach of an implied-in-fact contract bears upon the relationship between the individual parties and makes breaches of such agreements actionable between parties because of the nature of their *personal relationship*." (emphasis in original)); *Chandler v. Roach*, 156 Cal. App. 2d 435, 441 (1957) ("Unlike a copyright, a contract . . . is effective only between the contracting parties; it does not withdraw the idea from general circulation.  Any person not a party to the contract is free to use the idea without restriction.").

In "many idea-submission cases, the party who allegedly used the plaintiff's idea is not the same one to whom the idea was submitted.  In these cases, there are limits on the reach of [contract claims].  Contract claims are valid only against those with whom the plaintiff was in 'privity.'  As a result, a contract action will fail if the person to whom the plaintiff submitted the idea was not authorized— actually or apparently—to enter into contracts on behalf of the defendant."  4 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 19.05[C] (2011) (hereinafter "NIMMER").

### A.   Plaintiffs Have No Admissible Evidence of Privity.

#### 1.   No Direct Submission to Warner Bros.

To prove privity, Plaintiffs must have submitted their script (a) directly to Warner Bros. or (b) to someone with actual or apparent authority to receive submissions and enter in contracts on behalf of Warner Bros.  *See id*.  Plaintiffs did

-8-

1  neither.

2        There is no evidence of a direct submission to Warner Bros.  Plaintiffs do not

3  even contend that they or their literary agent had direct contact with Warner Bros.

4  regarding the Benay Script:

5       • Aaron Benay (Vol. 2) - "Q. And you didn't meet with anybody at

6         Warner Bros. in the 2000 time period about the script, did you?  A. I

7         did not.  Q. Did your brother?  A. He did not, no.  Q. Did your agent?

8         A. Not that I know of."  SS ¶ 68.

9       • Matthew Benay (Vol. 1) - "Q. . . . Have you had any conversations

10         with anyone who was at Warner Bros. at the time you had the

11         conversation with respect to, let's say, your screenplay first.  Let's start

12         there.  A. I did not personally have a conversation."  SS ¶ 69.

13       • Matthew Benay (Vol. 2) - "Q. Now, did you ever have any

14         conversations with [Warner Bros. executive] Mr. McCormick about

15         The Last Samurai?  A. No.  Q. Did you ever have any conversations

16         with anybody at Warner Bros. in the 2000 time period about The Last

17         Samurai?  A. Around the year 2000?  Q. Yeah.  A. No, not at 2000."

18         SS ¶ 70.

19       • David Phillips (Vol. 2) - "Q. And did you ever have any independent

20         conversations with Mr. McCormick about Last Samurai?  A. I do not

21         recall as I sit here today.  Q. Do you recall any other conversations

22         with anybody else at Warner Bros. regarding The Last Samurai?  A. I

23         do not recall."  SS ¶ 71.

24       **2.**    **No Admissible Evidence of Indirect Submission to Warner**

25           **Bros.**

26        Lacking direct privity, Plaintiffs alternatively assert two inconsistent theories

27  of agency:  (i) Mr. Cracchiolo was an agent of Warner Bros. and received the script

28  on Warner Bros.' behalf; and (ii) Mr. Cracchiolo agreed to act as Plaintiffs' agent

1   and submit the script to Warner Bros.  Regardless, both theories fail at the threshold
2   because there is no admissible evidence that Mr. Cracchiolo ever submitted the
3   Benay Script to Warner Bros.  The two pieces of evidence Plaintiffs have identified
4   to prove such a submission are inadmissible.
5        The first is Mr. Phillips' testimony that he spoke with Mr. Cracchiolo who,
6   reportedly excited about the Benay Script, asked permission to pitch it to Warner
7   Bros.  SS ¶ 51.  According to Mr. Phillips, Mr. Cracchiolo reported soon thereafter
8   that Warner Bros. decided to pass on the script.  SS ¶ 52.  This testimony is pure
9   hearsay and not subject to any exception.  It is an out-of-court statement offered for
10  the truth of the matter asserted—*i.e.,* that Mr. Cracchiolo in fact submitted the
11  Benay Script to Warner Bros.  *See* FED. R. EVID. 801.  Such hearsay cannot be used
12  to defeat summary judgment.  *See Orr v. Bank of Am.*, 285 F.3d 764, 773 (9th Cir.
13  2002) (affirming grant of summary judgment because once unauthenticated and
14  hearsay evidence was excluded, remaining evidence was not sufficient to raise a
15  genuine issue of material fact).
16       The second and only other piece of evidence Plaintiffs contend proves
17  Mr. Cracchiolo's submission to Warner Bros. is a purported e-mail from an
18  "anonymous" source that mysteriously surfaced last year.  Just days before the first
19  hearing on remand from the Ninth Circuit regarding Plaintiffs' sole surviving claim,
20  the parties and their counsel of record received in the mail copies of an anonymous
21  letter enclosing four attachments.  SS ¶ 53.  Dated March 29, 2011, the letter and its
22  attachments—three e-mails and one fax attaching excerpts from the Benay Script—
23  are remarkable.  Prepared by someone with intimate knowledge of the details of
24  this case, including the fatal void in Plaintiffs' privity case, these supposed
25  documents—never before seen or suggested throughout the entire history of this
26  case—try to stitch together and supply the missing facts to support the very theory
27  of privity Plaintiffs now assert.  SS ¶ 54.  For example, one of the e-mails purports
28  to be a message from Warner Bros. Vice President Kevin McCormick to Ed Zwick

MOTION FOR SUMMARY JUDGMENT
CV05-8508 PSG (FMOX)

1  in May 2000, in which Mr. McCormick states he has received a submission from

2  Mr. Cracchiolo at "Silver" called "The Last Samurai" (*i.e.,* the Benay Script).  SS

3  ¶ 55.

4        Each of these documents is a fake.  Each was plainly fabricated to help

5  Plaintiffs' case.  As discussed in Moving Defendants' impending Motion for

6  Terminating and Other Sanctions, Plaintiffs and their agents are the only people

7  with the motive, access, and ability to have created these forgeries.

8                    a.        **Plaintiffs Cannot Rely on Fabricated Evidence.**

9        To use the purported documents as evidence in this case, Plaintiffs must first

10  authenticate them.  Authentication is a prerequisite for admissibility.  FED. R. EVID.

11  901.  Unauthenticated documents cannot create a disputed issue of material fact to

12  defeat a motion for summary judgment.  *See* FED. R. CIV. PROC. 56(c), (e); *Can. v.*

13  *Blain's Helicopters, Inc.*, 831 F.2d 920, 925 (9th Cir. 1987) (unauthenticated

14  documents "may not be relied upon to defeat a motion for summary judgment");

15  Judge Gutierrez's Standing Order at 6(c)(2) ("Evidence submitted in . . . opposition

16  to a motion [for summary judgment] should be submitted . . . as exhibits to

17  declarations *sufficient to authenticate the proffered evidence*." (emphasis added)).

18  "The key purpose of authentication is to ensure that only genuine and trustworthy

19  evidence is considered."  5 WEINSTEIN'S EVIDENCE § 900.06[1][a].  Plaintiffs—as

20  proponents of the e-mail—bear the burden of proof.  *U.S. v. Blaylock*, 20 F.3d

21  1458, 1462 (9th Cir. 1994).

22        Plaintiffs cannot authenticate any of these new documents.  First and

23  foremost, every purported sender and recipient of these documents—Mr. Zwick,

24  Mr. Solomon, Mr. McCormick, and Mr. Logan—emphatically testified that they

25  did not author or receive any of the documents.  SS ¶ 85.

26        Furthermore, as detailed in Moving Defendants' forthcoming Motion for

27  Terminating and Other Sanctions and the attached Declaration of Erich Speckin, a

28  leading expert in forensic document analysis, none of the documents is genuine.

MOTION FOR SUMMARY JUDGMENT
CV05-8508 PSG (FMOX)

They are forgeries.

The fax attached to the anonymous letter allegedly sent by Mr. Zwick to Mr. Logan purports to contain Mr. Zwick's signature and handwritten notes. Mr. Zwick did not place his handwriting on this document; instead, as shown in Mr. Speckin's declaration, every piece of Mr. Zwick's handwriting was mechanically cut-and-pasted onto the purported fax from two documents in the Court record (BB00861 and BF5193).  SS ¶ 86.  As one example, reproduced below are Mr. Zwick's original signature on BB00861 (an April 18, 2000 letter) and the cut-and-paste copy on the purported fax (right):



SS ¶ 86.  Even a cursory visual analysis of these two signatures shows that they appear to be copies.  By inverting the colors of one signature and overlaying it on top of the other, it is possible to see that the shapes of the signatures, and specific deformations within these shapes are indeed identical (see below).  SS ¶ 86.



MOTION FOR SUMMARY JUDGMENT
CV05-8508 PSG (FMOX)

The e-mails are also fake.  Among other indicia, all three e-mails contain the identical inaccurate May 2000 time stamp.  If authentic, the timestamp on each of the e-mails would read "Pacific Daylight Time," which was observed that year from the first Sunday in April through the last Sunday in October.  SS ¶ 56.  Instead, the timestamp on all three indicates "Pacific Standard Time":



SS ¶ 72.  The creator of the three e-mails blundered when creating them.

Additionally, the framing elements of all three e-mails—*i.e.*, the material other than the substance of the e-mails—are identical, indicating they were generated by someone who used a blank AOL.com e-mail template and simply added the manufactured text into the appropriate blank spaces.  SS ¶ 57.  Because the e-mails were based on the same template, anything distinctive in the original framing elements—such as printing quirks or damage[4]—would create telltale similarities in each of the fabricated e-mails.  SS ¶¶ 57-58.  That is precisely the case here.

As one example (and there are others), an examination of the word "Shop"— the fifth tab below the "AOL.COM" logo—shows several distinct printing errors: (a) the "h" shows a distinctive rightward projection on the top of the far-right leg; (b) the "o" contains an unusual dent on the top left and (c) a squared corner on the top right, (d) as well as an unusually thick bottom-left quadrant; (e) the letter "p"

---

[4] Minor printing errors occur as a result of the way printers, copiers, and fax machines place ink on paper.  SS ¶ 58.  These errors generally appear randomly when a document is printed.  *Id.*  Because they occur randomly, if a person printed three e-mails in quick succession, it would be nearly impossible for the printer to generate the exact same printing errors on each document.  *Id.*

has unusually square corners at the top left and (f) top right, and (g) a deformation jutting into the empty space in the middle of the "p" from the upper left, as well as (h) a distortion that makes the lower leg of the "p" look more like a triangle than a straight line.  SS ¶ 59.  These errors are present in all three e-mails (SS ¶ 73)—for example, the following image compares the word "Shop" in the e-mail with the subject line "Pitch" to the e-mail with the subject line "Re: Pitch":



Comparison of Pitch E-Mail (white) and Re: Pitch E-Mail (black) (SS ¶ 73)

In light of uncontroverted expert evidence that the McCormick-Zwick e-mail and the other new documents are forgeries, the Court should refuse to consider them.  *See, e.g., Kluge v. Fugazy*, 739 F. Supp. 939, 940 (S.D.N.Y. 1990) (relying on affidavits from two handwriting experts stating that transparent overlay tests showed that two photocopies received from anonymous sources were not authentic); *see also U.S. v. Dreer*, 740 F.2d 18, 20 (11th Cir. 1984) ("extremely strong inference" that proposed evidence was fabricated where there was evidence

of "numerous other forged financial documents").

### 3. Plaintiffs Cannot Authenticate Anonymous Documents of Suspicious Origin.

In the meet-and-confer process, Plaintiffs have argued the documents can be authenticated based on circumstantial evidence (SS ¶ 74), pointing to, for example, Mr. Zwick's home e-mail address and other contents of the documents that they claim are consistent with the facts of this case (SS ¶ 75).[5]  *See* Fed. R. Evid. 901(b)(3) (document may be authenticated by "[c]omparison by the trier of fact . . . with specimens which have been authenticated"); *id.* at 901(b)(4) (authentication may be satisfied based on "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, *taken in conjunction with circumstances*") (emphasis added).

Plaintiffs misapprehend this principle.  Where a document's contents are held sufficient to authenticate it, the circumstances surrounding discovery of the document can *support* a finding of authenticity (*e.g.,* because they are found in defendant's possession) and the opposing party's claim that the document is a forgery is based on mere speculation.  *See Alexander Dawson, Inc. v. N.L.R.B.*, 586 F.2d 1300, 1302 (9th Cir. 1978) ("[t]he content of a document, *when considered with the circumstances surrounding its discovery*, is an adequate basis for [its authentication]" (emphasis added)); *Burgess v. Premier Corp.*, 727 F.2d 826, 835-36 (9th Cir. 1984) (court could find exhibits were adequately authenticated by the fact of being found in defendant's warehouse; *U.S. v. Black*, 767 F.2d 1334, 1342 (9th Cir. 1985) (documents were sufficiently authenticated by the fact they were found in defendant's possession).[6]

---

[5] Whoever fabricated these documents again blundered.  While the e-mail is sent at precisely the time—May 2000—Plaintiffs claim Warner Bros. received the Benay script, Mr. McCormick—purported sender of the e-mail—did not start working on *The Last Samurai* until two years later.  SS ¶ 61.

[6] *See also U.S. v. Dumeisi*, 424 F.3d 566, 574-75 (7th Cir. 2005) (court "must" consider circumstances surrounding discovery as well as physical

MOTION FOR SUMMARY JUDGMENT
CV05-8508 PSG (FMOX)

1    Here, in contrast, the new documents arrived *anonymously* in the mail some

2    *five* years after the litigation was filed, just days before the first hearing on remand,

3    seeming to shore up fatal flaws in the Plaintiffs' case after the Ninth Circuit

4    dismissed all of their other claims.  In these circumstances and with expert and

5    other evidence conclusively demonstrating that the documents are forgeries, the

6    documents cannot be authenticated.  *See Orr*, 285 F.3d at 778 n.24 (documents in

7    support of "a summary judgment motion could be authenticated by review of their

8    contents *if they appear to be sufficiently genuine*" (emphasis added)).

9    Defendants are unaware of any case that holds that a document of *anonymous*

10   *origin* can be authenticated solely by reference to its contents.  Such a document is

11   inherently suspicious, and a rule allowing it to be authenticated by its contents

12   alone would make no sense and simply reward the creator of a forgery.  As has

13   been explained, "[t]he primary concern in relying on the contents of an instrument

14   to prove its authenticity is the danger of forgery or substitution of a fraudulent

15   document."  *U.S. v. Wilson*, 532 F.2d 641, 644-45 (8th Cir. 1976).

16   For this principle to operate the (writing) must deal with a matter
     sufficiently obscure or particularly within the knowledge of the
17   persons corresponding so that the contents of the (writing) were not a
     matter of common knowledge.  The evidential hypothesis in the
18   authentication step is this: only those who knew the details in the
     (writing) could have written it; if the purported writer can be shown to
19   have probably known the details and if no other person is likely to
20

21

22   characteristics of documents); *U.S. v. Safavian*, 435 F. Supp. 2d 36 (D.D.C. 2006)
     (authenticating e-mails by addresses and contents where there was no evidence of
23   tampering, only speculation); *U.S. v. Vidacak*, 553 F.3d 344, 351 (4th Cir. 2009)
     (testimony of individual who seized records directly from office of foreign
24   government, in addition to other indicia of authenticity, was sufficient to
     authenticate documents as records of that government where defendant offered "no
25   basis for inferring that the exhibits were forged or altered that would arouse this
     Court's suspicion as to their authenticity"); *U.S. v. De Gudino*, 722 F.2d 1351,
26   1355-56 (7th Cir. 1983) (authenticating documents because contents of the lists
     provided prima facie evidence that they were written by someone involved in the
27   smuggling conspiracy, they were seized at the headquarters of the operation, and
     defendants provided no evidence that documents were forged).
28

-16-                      MOTION FOR SUMMARY JUDGMENT
                          CV05-8508 PSG (FMOX)

have known them when the (writing) was written, it is likely that he wrote it. The force of the inference decreases as the number of people who know the details and may have written the (writing) increases. Moreover, if there is a serious question of forgery, the inference is subject to being rebutted by the possibility that the details were added by someone to give an air of verity to the document rather than by the purported author who obtained the information in the usual way.

*Id.* (quoting 5 WEINSTEIN'S EVIDENCE § 901(b)(4)(01), at 46).

*Cavicchia v. Philadelphia Housing Authority* provides an almost perfect parallel. 2003 WL 22595210 (E.D. Pa. Nov. 7, 2003), *aff'd*, 137 Fed. Appx. 495, 496 (3rd Cir. 2005). In *Cavicchia*, plaintiff sued his former employer for retaliation, alleging that he was terminated for whistle-blowing. In opposing defendant's summary judgment motion, the plaintiff attached an internal memorandum purporting to be between two of defendant's executives—a veritable "smoking gun" document. *Id.* at \*6. Plaintiff's counsel contended "the document was found on his law office doorstep, left by an anonymous source" just days before the filing of plaintiff's opposition to summary judgment. *Id.* Both the alleged author and recipient of the memorandum did not recall sending or receiving it. *Id.* at \*7. The court granted defendant's motion to strike the document, without conducting an evidentiary hearing, since its authenticity was suspect. *Id.* Its similarity to other documents in the record, the court said, only made the purported memorandum *more* suspect. *Id.*

Just as in *Cavicchia*, this Court should refuse to consider a document that surfaced anonymously late in the litigation, where both the purported sender and recipient have testified it is not genuine. Here, of course, the case for excluding the McCormick-Zwick e-mail and other new documents is vastly stronger, since defendants have presented conclusive evidence that they are forgeries.

Without admissible evidence that Warner Bros. ever received the Benay Script, Plaintiffs' breach of implied-in-fact contract claim fails. *See, e.g., Grosso v.*

MOTION FOR SUMMARY JUDGMENT
CV05-8508 PSG (FMOX)

1   *Miramax Film Corp.*, No. B193872, 2007 WL 2585053, at *7-*9 (Cal. App. 2 Dist.

2   Sept. 10, 2007) (granting defendant Miramax summary judgment where plaintiff

3   submitted script to Gotham Entertainment, which had a "first look" deal with

4   Miramax, but "[t]here was no evidence of any communication between Gotham and

5   defendants with respect to plaintiff's ideas [and] no opinion testimony presented as

6   to the custom in the industry").

7   **B.      Plaintiffs Cannot Prove Mr. Cracchiolo Was Warner Bros.' Agent.**

8   **1.      Actual Authority**

9        Even if the Court were to admit Plaintiffs' unauthenticated documents and

10  accept the hearsay testimony of Plaintiffs' literary agent, Mr. Phillips, Plaintiffs'

11  claim still falls because Mr. Cracchiolo was not Warner Bros.' agent.  Actual

12  agency exists when "the agent is really employed by the principal."  CAL. CIV.

13  CODE § 2299.  As conceded by Mr. Phillips, Mr. Cracchiolo was an employee of

14  Silver Pictures in May 2000; he was not an employee of Warner Bros.  SS ¶¶ 28,

15  29, 76 ("Q. So Mr. Cracchiolo was an employee of Silver productions?  A. Silver

16  Pictures.  Q. Silver Pictures?  A. Yes, that's correct. . . .  Q. So you pitched the

17  project to Dan Cracchiolo who's an employee of Silver productions, is that right?

18  A. Correct.").  It is undisputed that Mr. Cracchiolo did not have actual authority to

19  enter into implied-in-fact contracts or any other contracts on behalf of Warner Bros.

20  SS ¶¶ 23, 77.

21  **2.      Apparent Authority**

22       Apparent agency (also known as "ostensible" agency) exists when a principal

23  "causes a third person to believe another to be his agent who is not really employed

24  by him."  *See* CAL. CIV. CODE § 2300.  Plaintiffs must prove three things:  (i) the

25  person dealing with the apparent agent had a reasonable belief in the agent's

26  authority, (ii) *such belief was generated by some act or neglect by the principal*,

27  and (iii) the person relying on the agent's apparent authority was not negligent in

28  holding that belief.  *See J.L. v. Children's Inst., Inc.*, 177 Cal. App. 4th 388, 403

-18-

(2009).  Apparent authority cannot be established by the representations or conduct of the purported agent alone; the statements or acts of the principal must cause the belief that agency exists.  *See id.*

Plaintiffs have no evidence that Warner Bros. made statements or took actions that caused Plaintiffs or Mr. Phillips to reasonably believe Mr. Cracchiolo was Warner Bros.'s agent.  In fact, as Plaintiffs admit, Warner Bros. made no statements at all to Plaintiffs or Mr. Phillips about Mr. Cracchiolo regarding the Benay Script.  SS ¶ 37.  Plaintiffs have no evidence that Warner Bros. created "circumstances which reek of authority" with respect to Mr. Cracchiolo.  *See Donahue v. Ziv Television Programs, Inc.*, 245 Cal. App. 2d 593, 609 (1966).  This should end the analysis.

In their meet-and-confer letter, Plaintiffs claimed Mr. Cracchiolo had apparent authority to bind Warner Bros. because:  (i) Warner Bros. distributed the films of Mr. Cracchiolo's employer, Silver Pictures, and (ii) Silver Pictures was located on the Warner Bros. lot.  SS ¶ 78.  These facts are insufficient to create apparent authority.

The fact that Warner Bros. distributed Silver Pictures' films does not and could not create apparent authority for Mr. Cracchiolo to enter into contracts on behalf of Warner Bros.  Otherwise, every movie studio could be bound to contracts for every idea submitted to every independent production company they work with.  *Mann v. Columbia Pictures, Inc.*, is directly on point.  128 Cal. App. 3d 628 (1982).  In *Mann*, plaintiff's representative submitted an idea to Harry Caplan, who plaintiff believed to be "an important man at Columbia [Pictures, Inc. ("Columbia")]" and who promised a Columbia reader would look at the work.  *Id.* at 636.  However, Mr. Caplan was actually an employee of Filmmakers, not Columbia.  *Id.* at 636, 640.  Because Filmmakers and Columbia were collaborating on a film, Columbia paid Mr. Caplan's salary.  *Id.*  The Court of Appeal rejected plaintiff's breach of implied-in-fact contract claim.  Although Columbia and Filmmakers had a business

relationship, Columbia paid Mr. Caplan's salary, and Mr. Caplan told plaintiff a Columbia reader would review her script, the Court held that Mr. Caplan had not "acted for Columbia" in accepting plaintiff's script. *Id.* at 647. *See also McCullough v. Lennar Corp.*, No. 09cv1808-AJB(NLS), 2011 WL 1585017, *11-13 (S.D. Cal. Apr. 26, 2011) (granting defendant's motion for summary judgment based in part on a finding that defendant undertook no conduct to "cause Plaintiff to reasonably believe that [employee] had the authority to bind Defendant" to a bonus structure, despite the fact that employee had "interviewing and hiring duties" for defendant). The absence of privity is much stronger here—Warner Bros. paid no compensation to Mr. Cracchiolo. SS ¶ 79.

Silver Pictures' location on the Warner Bros. lot does not create apparent authority. Presence on the studio does not establish apparent authority. In May 2000, there were over 25 independent movie production companies housed on the Warner Bros. lot. SS ¶ 27. In *Mann*, the court held that an employee of a production company located on Columbia Pictures' property did not have authority to act on behalf of the movie studio. 128 Cal. App. 3d at 640, 647. In accepting plaintiff's script submission, the production company employee did not create an implied-in-fact contract binding Columbia. *Id. See also Dill v. Berquist Constr. Co., Inc.*, 24 Cal. App. 4th 1426, 1437 (1994).

Both Plaintiffs and Mr. Phillips were well aware that independent production companies are routinely located on movie studio lots. SS ¶ 26. Mr. Phillips acknowledged as much, testifying that when *he* had a first look deal with a producer on the Twentieth Century Fox ("Fox") studio lot, he did not have authority to enter into contracts on behalf of the producer or Fox. SS ¶¶ 50.

Here, too, it was plain to any reasonable observer that Silver Pictures was an independent company and that its employee was not an agent of Warner Bros. For example, in May 2000, Silver Pictures (a) was in its own building, (b) with signs on the exterior of its building that read "Silver Pictures," not "Warner Bros."; (c) the

door to Silver Pictures' offices read "Silver Pictures," not "Warner Bros.";
(d) Silver Pictures had its own receptionist, employed by Silver Pictures (not Warner Bros.); (e) no Warner Bros. employees worked in Silver Pictures' offices; (f) Silver Pictures had its own phone number and fax number separate from Warner Bros.'s phone and fax numbers; (g) Silver Pictures had its own letterhead, fax cover sheets, envelopes, and business cards (none of which mentioned Warner Bros.); (h) no Warner Bros. executives were housed in the same building as Silver Pictures. SS ¶ 38.

Warner Bros. did nothing to cause Mr. Phillips to reasonably believe that Mr. Cracchiolo had the authority to enter contracts on behalf of Warner Bros.  In May 2000, Mr. Phillips was a literary agent with 10 years experience pitching screenplays in the film industry.  SS ¶¶ 3, 4, 5.  Mr. Phillips testified that:

- he knew Mr. Cracchiolo was not an employee of Warner Bros., but instead was an employee of Silver Pictures, (SS ¶ 29, 30);
- he had a long-running friendship with Mr. Cracchiolo, and often pitched scripts to him despite knowing that he "wasn't a development guy," (SS ¶¶ 31, 34, 35); and
- he knew from his prior experience in submitting materials to Mr. Cracchiolo that Mr. Cracchiolo would first evaluate the submission, then confer with Joel Silver about taking it to Warner Bros., then ask Mr. Phillips' permission to pitch it to Warner Bros., then pitch it to Warner Bros, who would themselves then evaluate the film, (SS ¶ 32).

Mr. Phillips' testimony establishes that he knew and understood that providing a script to Mr. Cracchiolo was not the same as providing it to Warner Bros., including that various layers of approval had to be granted within Silver Pictures before the script could even go to the studio.  With years of experience in the industry and no actions taken by Warner Bros., Mr. Phillips had no reasonable

basis to conclude that Mr. Cracchiolo—a friend and employee of an independent production company who had to jump through numerous hurdles just to submit a script to a movie studio—had the authority to bind that studio.  *See S. Sacramento Drayage Co. v. Campbell Soup Co.*, 220 Cal. App. 2d 851, 857-58 (1963) (holding that plaintiff who routinely dealt with employee of defendant did not reasonably rely on employee's authority to act on behalf of defendant when, in negotiating previous long-term contracts, the employee had reduced proposed agreements to writing and forwarded the agreements to a supervisor to evaluate and sign).  Since it would not have been reasonable for Mr. Phillips to believe that Mr. Cracchiolo was Warner Bros.'s agent, it also would not have been reasonable for Plaintiffs to believe it.  *See* CAL. CIV. CODE § 2332 ("As against a principal, both principal and agent are deemed to have notice of whatever either has notice of. . . ."); *O'Riordan v. Fed. Kemper Life Assurance*, 36 Cal. 4th 281, 288 (2005) (same).

In short, there is no evidence that Warner Bros. caused Plaintiffs to reasonably believe that Mr. Cracchiolo was its agent.  Furthermore*,* even under Plaintiffs' theory, the submission of an idea to an agent (Mr. Cracchiolo) of an agent (Silver Pictures) cannot establish an implied-in-fact contract.  *See Cassese v. Fox Broad. Co.*, No. B217655, 2010 WL 3129527, at *9 (Cal. Ct. App. Aug. 10, 2010) ("Plaintiffs have not cited, and we have not found, any authority to support the proposition that the knowledge of an agent . . . of an agent . . . is imputed to a principal. . . .  [Defendant] was simply too far removed from plaintiffs to have entered into an implied contract with them.").

## C.   Plaintiffs Cannot Prove Mr. Cracchiolo Submitted the Benay Script to Warner Bros. as Plaintiffs' Agent.

Plaintiffs' alternative (and also unpled) theory of privity is that Mr. Cracchiolo acted *as agent of the Plaintiffs*.  This theory also fails.  First, it is undisputed that Plaintiffs' agent was Mr. Phillips—not Mr. Cracchiolo.  SS ¶ 2. Second, it is undisputed that Mr. Cracchiolo was employed by Silver Pictures—not

MOTION FOR SUMMARY JUDGMENT
CV05-8508 PSG (FMOX)

Warner Bros.  SS ¶ 28, 29.  There is no evidence he was employed by Plaintiffs in any capacity.  Nor, as detailed above, is there admissible evidence that Mr. Cracchiolo received a copy of the Benay Script, that Mr. Cracchiolo ever agreed to act as Plaintiffs' agent, or that Mr. Cracchiolo pitched or submitted the Benay Script to Warner Bros.  This is dispositive since a "trial court can only consider admissible evidence in ruling on a motion for summary judgment."  *Orr*, 285 F.3d at 773.

### D.   Plaintiffs Are Not In Privity of Contract With Mr. Logan.

It is undisputed that Plaintiffs had no direct or indirect contact with Mr. Logan or anyone acting on his behalf prior to the time Plaintiffs' counsel contacted defendants in this litigation.  SS ¶¶ 9, 10, 39.  It is impossible for Plaintiffs to show they were in privity of contract with Mr. Logan.  *See Benay*, 607 F.3d at 634; *Donahue*, 245 Cal. App. 2d 593; *Rokos*, 182 Cal. App. 3d at 617; *Chandler*, 156 Cal. App. 2d at 441; NIMMER at § 19.05[C].  Plaintiffs have not even attempted to plead or argue a theory of privity as to Mr. Logan.  SS ¶¶ 41, 42, 80.  Any attempt to do so now would be futile.  *See Mann*, 128 Cal. App. 3d 628 (noting that because there was no evidence that plaintiff's script was submitted to a film's lead actor or screenwriter, but instead "that [her script] was [allegedly] submitted to defendant Columbia[,] the asserted contractual obligation exists, if at all, only between [plaintiff] and Columbia.").

## VI.   EVEN IF PLAINTIFFS COULD ESTABLISH PRIVITY, THEY STILL CANNOT PROVE OF AN IMPLIED-IN-FACT CONTRACT.

To prove an implied-in-fact contract, a plaintiff must show:  (i) plaintiff submitted the idea to defendants and defendants received them; (ii) plaintiff clearly conditioned the disclosure of the idea upon an obligation to pay; and (iii) defendants, with knowledge of that duty, voluntarily accepted the information and used the idea.  *See Mann*, 128 Cal. App. 3d at 646-47 n.6; *see also Grosso*, 2007 WL 2585053, at *6.

1    As explained, Plaintiffs cannot prove the first element because their only

2    evidence that their script was submitted to Warner Bros. comes from their literary

3    agent's hearsay testimony and the forged McCormick-Zwick e-mail.  *See* section

4    V(a)(2) *supra*.  Moreover, even assuming this evidence were admissible, it is still

5    insufficient to permit a trier of fact to find that the submission of the script was

6    "clearly conditioned" on an obligation to pay or that Warner Bros. knew of this

7    condition.  There is simply no suggestion that Mr. Cracchiolo or Warner Bros.

8    knew of any such condition.  Indeed, Mr. Phillips' testimony that Mr. Cracchiolo

9    could not get Warner Bros. "to get excited about it *or* buy it *or* take it further" (SS

10   ¶ 82) suggests that purchasing the script was not the sole aim or condition upon

11   which it was submitted.  The mere conveyance of an idea to a producer or studio,

12   even if made with the expectation of payment, is insufficient to create an implied-

13   in-fact contract.  *Desny v. Wilder*, 46 Cal. 2d 715, 739 (1956).

14   With respect to Mr. Logan, Plaintiffs have no evidence that the Benay Script

15   was ever pitched or submitted to Mr. Logan by Plaintiffs or their agents.   SS ¶ 9,

16   10, 39.  The only evidence Plaintiffs have that Mr. Logan ever saw the Benay Script

17   is the unauthenticated and inadmissible forged fax, in which Mr. Zwick purportedly

18   sends pages from the Benay Script to Mr. Logan without discussion of their origin.

19   SS ¶ 84.  Even if the forged fax were authentic and admissible, Plaintiffs would still

20   have no evidence that *Plaintiffs* submitted the Benay Script to Mr. Logan; that

21   *Plaintiffs* clearly conditioned the disclosure of the idea upon an obligation to pay;

22   or that Mr. Logan voluntarily accepted the Benay Script with knowledge of that

23   duty.  *See Mann*, 128 Cal. App. 3d at 646-47 n.6.

24   **VII.   CONCLUSION**

25   For the foregoing reasons, Warner Bros. and Mr. Logan respectfully request

26   the Court enter summary judgment in their favor on Plaintiffs' only remaining

27   cause of action—breach of implied-in-fact contract—because there is no genuine

28   dispute that Plaintiffs were not in privity of contract with either Warner Bros. or

-24-

MOTION FOR SUMMARY JUDGMENT
CV05-8508 PSG (FMOX)

1   Mr. Logan.  As such Plaintiffs cannot establish an implied-in-fact contract with

2   either Warner Bros. or Mr. Logan.

3

4       Dated:     December 2, 2011

                                          By:

6                                         Daniel M. Petrocelli

7                                       Attorneys for Defendants WARNER

8                                       BROS. ENTERTAINMENT, INC. and JOHN LOGAN

MOTION FOR SUMMARY JUDGMENT
CV05-8508 PSG (FMOX)