QUINN EMANUEL URQUHART & SULLIVAN LLP
Gary E. Gans (Bar No. 89537)
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone: (213) 443-3000
Facsimile: (213) 443-3100
Email: garygans@quinnemanuel.com

BAKER MARQUART LLP
Jaime W. Marquart (Bar No. 200344)
10990 Wilshire Blvd., Fourth Floor
Los Angeles, California 90024
Telephone: (424) 652-7800
Facsimile: (424) 652-7850
Email: jmarquart@bakermarquart.com

Attorneys for Defendants The Bedford Falls
Company (erroneously sued as Bedford Falls
Productions, Inc.), Edward Zwick and Marshall
Herskovitz

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| AARON BENAY, an individual, *et al.*,<br><br>      Plaintiffs,<br><br>      v.<br><br>WARNER BROS. ENTERTAINMENT, INC., a Delaware corporation, *et al.*,<br><br>      Defendants. | CASE NO. CV 05-8508 PSG (FMOx)<br><br>**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OF DEFENDANTS THE BEDFORD FALLS COMPANY, EDWARD ZWICK AND MARSHALL HERSKOVITZ; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>[Declarations of Edward Zwick, Marshall Herskovitz, Richard Solomon and Jaime W. Marquart; Separate Statement of Uncontroverted Material Facts and Conclusions of Law; Notice of Lodging; and Proposed Order filed herewith]<br><br>Date:   March 5, 2012<br>Time:   1:30 p.m.<br>Ctrm.:   880<br><br>Date Filed:   December 5, 2005<br>Trial Date:   March 26, 2012 |

TO THE CLERK OF COURT AND TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT on March 5, 2012, at 1:30 p.m., or as soon thereafter as counsel may be heard before the Honorable Philip S. Gutierrez, in Courtroom 790 of the above-entitled Court, located at 255 East Temple Street, Los Angeles, California 90012, Defendants The Bedford Falls Company ("Bedford Falls") (erroneously sued as Bedford Falls Productions, Inc.), Edward Zwick ("Zwick") and Marshall Herskovitz ("Herskovitz") will, and hereby do, move pursuant to Fed. R. Civ. P. 56 for an order granting summary judgment in their favor and against Plaintiffs Aaron Benay and Matthew Benay ("Plaintiffs") on Plaintiffs' sole remaining claim for relief for breach of implied-in-fact contract.

This motion is made on behalf of Zwick and Herskovitz on the grounds that Plaintiffs' breach of implied-in-fact contract claim fails as a matter of law because there was no privity of contract between Plaintiffs and either Zwick or Herskovitz. *See Benay v. Warner Bros. Entm't, Inc.*, 607 F.3d 620, 634 (9th Cir. 2010).

This motion is further made on behalf of Zwick, Herskovitz and Bedford Falls on the grounds that Plaintiffs' breach of implied-in-fact contract claim is barred by the statute of limitations because the recent deposition testimony of Plaintiffs' agent establishes that Plaintiffs' claims accrued more than two years prior to filing suit. *Blaustein v. Burton*, 9 Cal. App. 3d 161, 186 (1970).

This motion is based upon this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, the Declarations of Edward Zwick, Marshall Herskovitz, Richard Solomon and Jaime W. Marquart and such other evidence filed concurrently herewith, the Separate Statement of Uncontroverted Facts and Conclusions of Law, the pleadings and records on file in this action, and on such other and further evidence as the Court may consider at or before the hearing.

1       Counsel for the moving defendants, Gary E. Gans and Jaime W. Marquart had

2   a telephonic meet and confer meeting with Plaintiffs' counsel, Jonathan A. Marder,

3   pursuant to Local Rule 7-3, and discussed all of the bases for the instant motion for

4   summary judgment.

5

6   DATED:  December 19, 2011    QUINN EMANUEL URQUHART
                           & SULLIVAN LLP

7                              BAKER MARQUART LLP

8

9                              By  /s/ Gary E. Gans

10                                Gary E. Gans
                              Attorneys for Defendants Bedford Falls

11                                Company (erroneously sued as Bedford Falls
                              Productions, Inc.), Edward Zwick and Marshall

12                                Herskovitz

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES..............................................1

Preliminary Statement ....................................................................................1

Statement of Undisputed Facts .........................................................................3

    A.    Background Facts and History of *The Last Samurai* ..............................3

    B.    Procedural History and Remaining Issues on Remand.........................5

    C.    The Submission of the Benay Screenplay and Contractual Privity........7

    D.    The Intended Use and the Accrual of the Claim....................................9

    E.    Plaintiffs' Knowledge of Their Claim ................................................11

Argument ....................................................................................................12

I.    LEGAL STANDARD ...........................................................................12

II.    SUMMARY JUDGMENT OF PLAINTIFFS' IMPLIED-IN-FACT
CONTRACT CLAIM SHOULD BE GRANTED AS TO ZWICK AND
HERSKOVITZ  BECAUSE OF THE LACK OF PRIVITY.........................13

    A.    Plaintiffs Did Not Submit Ideas to Zwick or Herskovitz ....................15

    B.    Solomon Was Not the Agent of Zwick or Herskovitz.........................15

III.    SUMMARY JUDGMENT SHOULD BE GRANTED AS TO
BEDFORD FALLS, ZWICK AND HERSKOVITZ BECAUSE
PLAINTIFFS' CLAIM ACCRUED MORE THAN TWO YEARS
BEFORE THEY FILED SUIT....................................................................16

    A.    A Claim for Breach of an Implied-In-Fact Contract Involving the
Production of a Motion Picture Accrues Upon Plaintiffs' Notice
of  Any Sale or Other Exploitation of the Work...................................17

    B.    Plaintiffs' Agent, the Person Who Allegedly Formed the
Implied-in-Fact Contract, Established that the Intended Use of
Plaintiffs' Work Occurred When the Film Was Produced...................18

Conclusion ..................................................................................................23

## TABLE OF AUTHORITIES

**Page**

## CASES

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ...................................................................................... 13

*Benay v. Warner Bros. Entm't, Inc.*,
   607 F.3d 620 (9th Cir. 2010) ............................................................... passim

*Blaustein v. Burton*,
   9 Cal. App. 3d 161 (1970) ..................................................................... passim

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ............................................................................... 12, 13

*Chandler v. Roach*,
   156 Cal. App. 2d 435 (1957) ................................................................. 14, 15

*Davies v. Krasna*,
   14 Cal. 3d 502 (1975) ...................................................................... 3, 17, 18

*Desny v. Wilder*,
   46 Cal. 2d 715 (1956) ................................................................................ 15

*Dillon v. Board of Pension Com'rs of City of Los Angeles*,
   18 Cal. 2d 427 (1941) ................................................................................ 17

*Donahue v. United Artists*,
   2 Cal. App. 3d 794 (1969) .......................................................... 3, 15, 17, 18

*Donahue v. Ziv Television Programs, Inc.*,
   245 Cal. App. 2d 593 (1966) ................................................................. 14, 15

*Haglund v. Dow Chemical Co.*,
   218 U.S.P.Q 55 (1982) ............................................................................... 18

*Mann v. Columbia Pictures*, Inc.,
   128 Cal. App. 3d 628 (Cal. App. 2d Dist. 1982) ..................................... 15, 16

*Rokos v. Peck*,
   182 Cal. App. 3d 604 (1986) ...................................................................... 13

## STATUTES

*Cal. Code Civ. P. § 339* ....................................................................... 13, 16

## **OTHER AUTHORITIES**

4 Melville B. Nimmer & David Nimmer,
   *Nimmer on Copyright* § 19.05[C] (2011)..................................................14, 15

## MEMORANDUM OF POINTS AND AUTHORITIES

### Preliminary Statement

This case is about two distinctly *dissimilar* works based on the same historical facts for which Plaintiffs Aaron Benay and Matthew Benay (the "Benays") take credit.  As the Court found and the Ninth Circuit affirmed, the screenplay written by the Benays (the "Benay Screenplay") and Defendants' motion picture, *The Last Samurai* (the "Film"), are not substantially similar as a matter of law; rather they have manifestly different characters, plots, dialog, settings, *etc*.  The only similarities between the works are their titles, historical facts (including the historical figure called "The Last Samurai"), well-known dramatic conventions and scenes that necessarily flow from these facts and conventions.

Nevertheless, the Benays seek a jury trial on their last remaining claim for breach of an implied-in-fact contract.  The Benays allege that their agent orally pitched and later sent the Benay Screenplay to Defendant The Bedford Falls Company ("Bedford Falls") under circumstances which created an implied contract to compensate the Benays if it used the Benay Screenplay to produce a motion picture, and that Bedford Falls actually used their screenplay to produce the Film.

While the evidence will show that the Benays did not submit the Benay Screenplay to Bedford Falls and that none of the Defendants used the Benay Screenplay to produce the Film, there is no genuine dispute that:  (i) the Benays did not even submit their screenplay to either Defendant Edward Zwick ("Zwick") or Defendant Marshall Herskovitz ("Herskovitz"); and (ii) the Benays waited more than two years after the purported use of their screenplay to file this lawsuit.  Therefore, the Benays' claim for breach of implied contract fails as a matter of law: (i) as to Zwick and Herskovitz based on a lack of privity of contract; and (ii) as to all Defendants based on the statute of limitations.

1    In the four years since the last motion for summary judgment was filed in this
2    case, a number of significant developments have altered the legal framework and
3    context of the issues presented in this motion.  First, the Ninth Circuit agreed with
4    this Court that Plaintiffs' copyright infringement action had no merit, finding no
5    substantial similarity between protectable elements in the Benay Screenplay and the
6    Film and that the similarities between the two works consisted of the title, some
7    shared historical facts and stock devices (or *scenes-a-faire*) flowing naturally from
8    the historical setting and subject matter.

9    Second, the Ninth Circuit wrote that "the accrual date of an implied-in-fact
10   contract claim 'depends on the nature of [Defendants'] obligation, if any, to [the
11   Benays]'" and, therefore, "if their claim accrued at any point before the Film's
12   release, it is time barred."  *Benay v. Warner Bros. Entm't, Inc.*, 607 F.3d 620, 633
13   (9th Cir. 2010).

14   Third, the Ninth Circuit also wrote that "[p]rivity between the parties is a
15   necessary element of an implied-in-fact contract claim," and "[w]e leave it to the
16   district court to decide this question . . . ."  *Id.* at 634.

17   Fourth, at Plaintiffs' request, this Court ordered additional discovery relating
18   to the alleged submission of the Benay Screenplay to the Defendants.  This
19   discovery not only proved the falsity of the anonymously submitted documents upon
20   which Plaintiff has relied to argue that Defendants received the Benay Screenplay,
21   but it also established several undisputed facts as to critical issues, *i.e.* the party with
22   whom the contract was purportedly formed, the nature of the purported obligations
23   to the Benays and the date of the purported breach.  The Benay's agent, David
24   Phillips ("Phillips"), testified that (i) he spoke only with The Bedford Falls
25   Company, not with any other Defendant; (ii) the "use" of the screenplay
26   contemplated by the implied-in-fact contract included the sale of the Benay
27   Screenplay to a studio and the production of a motion picture, not the release of the
28

Film to the public; and (iii) the contract provided, and the Benays expected, that the Benays would be compensated when that sale occurred and at various subsequent times during production of the Film (and prior to its release).

This testimony – by the only person who communicated with any of the Defendants and, thus, the only person who could have formed the implied-in-fact contract – is fatal to Plaintiffs' implied-in-fact contract claim for two reasons:  (1) it establishes a lack of privity with Zwick and Herskovitz, and (2) it demonstrates that the claim is time-barred because it accrued at the latest upon the "sale or other exploitation" of the screenplay without compensation.  *See Davies v. Krasna*, 14 Cal. 3d 502, 511-12 (1975) (*citing Donahue v. United Artists*, 2 Cal. App. 3d 794, 801-802 (1969)) (claim for breach of an implied-in-fact contract arises "with the sale or exploitation of the idea").[1]

Therefore, as demonstrated below, Zwick, Herskowitz and Bedford Falls are entitled to summary judgment.

## Statement of Undisputed Facts

### A.   Background Facts and History of *The Last Samurai*

Zwick is a motion picture director who has directed, among other films, the Academy-award winning film, *Glory* (1989), *Legends of the Fall* (1994), *Courage Under Fire* (1996), *The Siege* (1998), *Blood Diamond* (2006), *Defiance* (2010), *Love and Other Drugs* (2010) and *The Last Samurai* (2003).  Zwick and Herskovitz have co-produced, among other films, *Legends of the Fall* (1994), *Shakespeare in Love* (1998) (winner of seven Academy Awards), *Traffic* (2000) (nominated for the

---

[1]   Thus, the Court's previous ruling with respect to the statute of limitations to the effect that there was a genuine issue as to whether the "use" for which Plaintiffs expected compensation might have been the production *and* distribution of the Film and, therefore, the claim did not accrue until its public release – must be revisited in light of Mr. Phillips' uncontroverted testimony to the contrary and the Ninth Circuit's opinion.

1  Academy Award for Best Picture), *Blood Diamond* (2006) (nominated for two
2  Academy Awards), *Defiance* (2010), *Love and Other Drugs* (2010) and *The Last*
3  *Samurai* (2003) (nominated for four Academy Awards).  In television, Zwick and
4  Herskovitz were creators and Executive Producers of *thirtysomething*, as well as *My*
5  *So-Called Life* and *Once and Again*.  Declaration of Edward Zwick in Support of
6  Motion for Summary Judgment dated December 19, 2011 ("Zwick Dec.") ¶ 2.

7        The genesis of *The Last Samurai* dates back more than three decades to when
8  Zwick became interested in Eastern Studies while an undergraduate at Harvard
9  College.  Zwick Dec. ¶ 3.  In particular, Zwick became fascinated with Japanese
10 culture and the Samurai films of Akira Kurosawa.  *Id*.  Shortly after his graduation,
11 Zwick read a book entitled *The Nobility of Failure:  Tragic Heroes in the History of*
12 *Japan*, written by Ivan Morris, which details the rise and fall of Saigo Takamori,
13 known as "The Last Samurai," and the Satsuma Rebellion. *Id*.

14       In 1997, Radar Pictures offered Zwick the opportunity to direct a screenplay
15 then known as *West of the Rising Sun*, which was described as:  "An American Civil
16 War veteran journeys to Japan in 1871 during the country's own civil war . . . .  His
17 adventure helps him reaffirm the meaning of life and the will to live it well."  Zwick
18 Dec. ¶ 4.  Zwick decided not to direct the project.  However, he retained an interest
19 in creating a film which would combine the tradition of Kurosawa's Samurai genre
20 with that of John Ford's westerns.  *Id*.  In December 1999, Zwick conceived a new
21 approach to the story of a Westerner confronting Japanese culture – an "Eastern
22 Western."  Zwick Dec. ¶ 4.

23       In late 1999, Zwick met Defendant John Logan ("Logan"), the Academy
24 Award-nominated writer of such films as *Gladiator* (2000) and *The Aviator* (2004).
25 He invited Logan in early 2000 to work on the "Eastern Western."  Logan was
26 enthusiastic about the project and agreed to start immediately.  The film that resulted
27 from their efforts was *The Last Samurai*.  Zwick Dec. ¶ 5.

28

On October 5, 2000, Bedford Falls entered into a production and development agreement with Defendant Warner Bros. Entertainment, Inc. ("Warner Bros.") for the production and development of the Film.  By the terms of that agreement, Bedford Falls received fixed compensation as follows:  (a) 20% when the film was "set for production" (meaning when the final screenplay and budget have been approved by Warner Bros., the principal cast members and director have been engaged and a definite start date has been scheduled for commencement of principal photography, but in no event later than commencement of principal photography); (b) 60% in approximately equal weekly installments commencing eight weeks prior to the scheduled commencement of principal photography; (c) 10% upon completion of dubbing and scoring of the film; and (d) 10% upon delivery of the answer print of the completed film.  Separate Statement of Facts and  Conclusions of Law in Support of Motion for Summary Judgment dated December 19, 2011 ("Bedford Falls SS") 2.

Principal photography for the Film on March 12, 2003, and wrapped on May 9, 2003.  Bedford Falls SS 3.  Dubbing and scoring was completed on or about November 1, 2011 (Bedford Falls SS 4), and the answer print of the completed film was delivered on or about November 8, 2011.  Bedford Falls SS 5.  The Film was released in the United States on December 5, 2003.  Bedford Falls SS 6.

**B.     Procedural History and Remaining Issues on Remand**

Plaintiffs filed this action on December 5, 2005, asserting claims for relief for copyright infringement, breach of implied-in-fact contract and intentional interference with prospective economic advantage.  Bedford Falls SS 7.  Plaintiffs alleged that their agent submitted the Benay Screenplay to Bedford Falls for its consideration for development of a motion picture, and that Bedford Falls thereafter used the Benay Screenplay to produce the Film.  *Id*.  Plaintiffs further alleged that

1 this use constituted copyright infringement and breach of an implied-in-fact
2 contract. *Id*.

3       On Defendants' motion to dismiss, the Court dismissed the intentional
4 interference claim at the outset of the litigation. On March 14, 2008, the Court
5 granted summary judgment as to the claim for copyright infringement on the ground
6 that there was no substantial similarity between the Benay Screenplay and the Film
7 and granted summary judgment as to the breach of implied-in-fact contract claim on
8 the ground that there was no substantial similarity between the Film and "novel"
9 aspects of the Benay Screenplay. Bedford Falls SS 8.

10       On appeal, the Ninth Circuit affirmed summary judgment of the copyright
11 infringement claim, finding that the works' similarities, to the extent any existed,
12 consisted of non-copyrightable elements such as their title, shared historical facts
13 and shared stock devices (*scenes-a-faire*). *Benay*, 607 F.3d 620, 624-629. The
14 Ninth Circuit reversed and remanded with respect to the breach of implied-in-fact
15 contract claim because novelty is not an element of that claim. *Id.* at 622.

16       The Ninth Circuit specifically left open for resolution by the District Court
17 the question of whether Plaintiffs could establish privity, a "necessary element of an
18 implied-in-fact contract claim." *Id*. at 634. As shown below, Plaintiffs cannot
19 establish privity as to Zwick or Herskovitz because, at most, their agent only
20 submitted the Benay Screenplay to Bedford Falls, not to Zwick or Herskovitz.

21       The Ninth Circuit also addressed the statute of limitations issue. It wrote that
22 "if the claim accrued at any point before the Film's release, it is time-barred" and
23 that the accrual date "'depends on the nature of [Defendants'] obligation, if any, to
24 [the Benays].'" *Id*. at 633 (citing *Blaustein v. Burton*, 9 Cal. App. 3d 161, 185
25 (1970)). As shown below, undisputed facts discovered after remand demonstrate

26
27
28

MSJ OF DEFENDANTS BEDFORD FALLS COMPANY, EDWARD ZWICK AND MARSHALL HERSKOVITZ

1  that Plaintiffs' claim accrued before the Film's release and, therefore, summary

2  judgment is now appropriate.[2]

3      On remand, at the request of Plaintiffs, this Court allowed further discovery

4  regarding the submission of the Benay Screenplay, including the deposition (for the

5  first time) of Plaintiffs' agent, Phillips.  Phillips is undisputedly the only person

6  involved in submitting the Benay Screenplay to any Defendant and the only person

7  who allegedly communicated with any Defendant about the screenplay.  As

8  discussed below, Phillips' testimony now removes any question of fact as to the use

9  intended by Plaintiffs and the date of accrual of their claim.

10      **C.**    **The Submission of the Benay Screenplay and Contractual Privity**

11      In early 2000, Plaintiffs engaged Phillips to try to sell the Benay Screenplay.

12  Bedford Falls SS 9.  Plaintiffs allege that on or about May 9, 2000, Phillips pitched

13  the screenplay to certain individuals and production companies, including Richard

14  Solomon ("Solomon"), the President of Bedford Falls at the time.  *Id*.  In discovery,

15  the Benays admitted that Phillips was the only person with personal knowledge as to

16  the actual circumstances attending the submission of the script to Bedford Falls.

17  Bedford Falls SS 10.  Phillips' testimony, which was not provided until after

18  remand, is clear – he pitched the Benay Screenplay to Solomon in Solomon's

19  capacity as an officer of Bedford Falls only "[b]ecause my arrangement with

20

21  _____

22      [2]   On April 25, 2007, in ruling on a prior motion for summary judgment, this
    Court ruled that "Plaintiffs have raised a triable issue regarding the accrual date of
23  the action" because the "claim hinged on whether use as defined by the implied-in-
    fact contract between the parties occurred when Plaintiffs 'produced and distributed'
24  a motion picture as opposed to whether they simply 'produced' or 'developed'
    material based upon the allegedly stolen idea."  Order Denying Defendants' Motion
25  for Partial Summary Judgment dated April 25, 2007 ("4/25/07 MSJ Order") at 4.
    However, newly discovered evidence shows unequivocally that there is no longer
26  such a triable issue.

27

28

1  Solomon was, 'Do you want to see a screenplay and will you accept it as a

2  submission of mine *to Bedford Falls*?'"  Bedford Falls SS 11.   (emphasis added).

3        Consistent with this testimony, Phillips also testified that he did not submit

4  the Benay Screenplay to either Zwick or Herskovitz in their individual capacities; in

5  fact, he never even met or spoke to Zwick or Herskovitz:

6        Q:    By the way, did you ever speak to Ed Zwick about the

7              Last Samurai or the Benay brothers?

8        A:    No, I don't believe so.

9        Q:    Have you ever met him?

10       A:    No.

11       Q:    Have you ever spoken with him?

12       A:    No.

13       Q:    Did you ever speak to Ed Herskovitz about Last Samurai

14             or the Benay brothers?

15       A:    "Marshall Herskovitz"?

16       Q:    Marshall.

17       A.    No.

18  Bedford Falls SS 12.

19       Zwick's and Herskovitz's testimony is the same:  They never met or spoke to

20  Phillips and never received any submission of a screenplay by Aaron or Matthew

21  Benay.  Bedford Falls SS 13.  There simply is no evidence that Phillips, the Benays

22  or anyone else submitted the Benay Screenplay to Zwick or Herskovitz in their

23  individual capacities.  Plaintiffs have had *years* to discover facts to the contrary, but

24  have not done so.

25       It is also undisputed that Solomon was only an officer and agent of Bedford

26  Falls.  Bedford Falls SS 14.  Solomon was not employed by Zwick or Herskovitz in

27  their personal capacities, was not their agent and did not work directly for either of

28

1  them as, for example, a personal assistant.  *Id.*  Significantly, Phillips was aware at

2  the time that Solomon was acting on behalf of *Bedford Falls*:

3      Q:      Now, you knew that Solomon was – was acting on behalf of

4              Bedford Falls, right?

5      A:      Yes.

6  Bedford Falls SS 15.

7      Thus, Plaintiffs did not submit the Benay Screenplay to either Zwick or

8  Herskovitz; they did not even communicate with either one.  Accordingly, as will be

9  demonstrated below, there could be no privity of contract.

10      **D.      The Intended Use and the Accrual of the Claim**

11      Although this Court previously found a triable issue of fact regarding the

12  terms of the alleged implied-in-fact contract, Phillips' recent deposition testimony

13  now establishes not just to *whom* the screenplay was submitted, but also *the precise*

14  *terms* of the alleged contract and *when the claim for breach accrued*.  From these

15  undisputed facts, it follows that Plaintiffs' claim for breach of implied-in-fact

16  contract accrued by May 2003 at the latest, over two years before Plaintiffs filed

17  suit.

18      On November 16, 2007, after the District Court ruled on Defendants' first

19  motion for summary judgment on statute of limitations grounds, and in opposition to

20  a new motion for summary judgment, Phillips testified by declaration that the terms

21  of the implied-in-fact contract formed when he submitted the Benay Screenplay to

22  Bedford Falls were that "if the Screenplay was used to *produce* a feature film, my

23  clients would be compensated."  Bedford Falls SS 16.  (emphasis added).  Thus, the

24  "use" of Plaintiffs' ideas, which gives rise to a claim for breach of implied-in-fact

25  contract, occurred when the Film was "*produced*."

26      Then, when Defendants deposed Phillips about the alleged contract in 2011,

27  he testified that, under the purported implied-in-fact contract with Bedford Falls, the

28

1  Benays would be entitled to compensation if the screenplay was used in any way in

2  the production of a film (although he did not know who would make such a

3  payment):

4       Q:     Was it your understanding that if the Benays' Screenplay

5              was used in any way in the production of a

6              feature film, that the Benays would be compensated

7              be compensated by Bedford Falls?

8       A:     Again, I don't know if Bedford Falls would be doing the

9              compensating.

10      Q:     Ok.  Bedford Falls or somebody to whom Bedford Falls

11             sold the project?

12      A:     Yes.

13  Bedford Falls SS 17.

14      Phillips was then asked specifically what he meant by the phrase "used to

15  produce a feature film" in his declaration.  He affirmed that the "use" with respect to

16  the Bedford Falls submission meant "used in the production of a film."  *See*, *e.g.*,

17  Bedford Falls SS 18  (". . . I mean, I would say if the screenplay I sent [Solomon]

18  which he received from me was something he put forth that was then involved in a

19  feature film he was involved in producing, my client should be compensated");

20  Bedford Falls SS 18  ("If the Benays' work was used to produce a feature film, it

21  was my understanding that they, like anyone, should be compensated").

22      Phillips also testified as to when the Plaintiffs would be entitled to

23  compensation.  He testified specifically that, pursuant to the alleged agreement with

24  Bedford Falls, the Benays would get paid "at least some money at the time the

25  literary property was optioned or purchased."  Bedford Falls SS 19.  He further

26  testified that Plaintiffs would be entitled to payment when principal photography of

27  a film commenced and when principal photography ended.  Bedford Falls SS 20.

28

### E.   Plaintiffs' Knowledge of Their Claim

Plaintiffs knew by May 2003, at the latest, that Bedford Falls was producing the Film for Warner Bros. based upon what they claimed to be the ideas Phillips pitched to Bedford Falls and that they had not been paid for that use.

In 2002, Plaintiffs engaged their former counsel, Glen Kulik, to pursue a claim against Bedford Falls for its alleged use of the Benay Screenplay.  Kulik acknowledged that his clients obtained a draft of the shooting script for the Film, which Plaintiffs claim is based on their own script, as early as 2002, and Defendants' counsel sent him the revised shooting script on June 2, 2003.  Bedford Falls SS 21-23.  In letters to Defendants' counsel, Plaintiffs repeatedly claimed that these scripts were based on the Benay Screenplay and threatened a lawsuit because of the harm caused to the value of the Benay Screenplay, and Defendants repeatedly refused to pay compensation to Plaintiffs.  Bedford Falls SS 24.

Thus, Plaintiffs' counsel sent a number of letters and a draft complaint to Bedford Falls and Warner Bros. as follows:

1.   On October 30, 2002, (over three years before Plaintiffs filed suit), Kulik wrote to Defendants: "there is good reason to question the origin of your script*, which destroyed the potential market value of an important piece of work that took [Plaintiffs] years to create and develop . . . .*"  Bedford Falls SS 25 (emphasis added).

2.   On May 12, 2003, (over two and a half years before Defendants filed suit), Kulik wrote to Warner Bros.' general counsel, threatening to "*proceed with a lawsuit*, and enclosing "a copy of the complaint we drafted and *which we plan to file*. . . ."  Bedford Falls SS 26.   (emphasis added).

3.   Plaintiffs' draft complaint alleged:  "Because they are *producing* the Film and *planning* to release it to the public, [Bedford Falls] was and is contractually obligated to pay compensation and afford screen credit to the

Benay Bros. *In late 2002, [Bedford Falls] breached the [implied] contract by notifying [Plaintiffs] it would not pay the promised compensation* or give the promised screen credit." Bedford Falls SS 27 (emphasis added).

4.     On May 20, 2003 (two and a half years before Plaintiffs filed suit) – Kulik wrote, "This is the final letter that I am going to write. . . . *We will wait until the end of May to receive [the promised documents].  If we do not, we will proceed to file the complaint*." Bedford Falls SS 28 (emphasis added).

Notably, Plaintiffs' draft complaint, while it named Warner Bros., Radar Pictures, Inc. and Bedford Falls as defendants, only brought the implied-in-fact contract claim against *Bedford Falls -- it did not name Zwick or Herskovitz.*

### <u>Argument</u>

## I.     <u>LEGAL STANDARD</u>

Defendants are entitled to summary judgment if there is no genuine issue of material fact as to any element of Plaintiffs' claim or any affirmative defense. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A non-moving party who bears the burden of proving an element essential to its case must sufficiently establish a genuine dispute of fact with respect to that element or face summary judgment. *Id.*, 477 U.S. at 322-23.  Defendants need not prove there is "literally no evidence" supporting Plaintiffs' claim, rather they need only show there is insufficient evidence for a jury to find in Plaintiffs' favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).

"Privity between the parties is a necessary element of an implied-in-fact contract claim." *Benay*, 607 F.3d at 634.  Thus, Zwick and Herskovitz are entitled to summary judgment if there is no genuine issue of material fact on the issue of privity.

The statute of limitations for an implied-in-fact contract claim is two years. California Code of Civil Procedure § 339; *Blaustein v. Burton*, 9 Cal. App. 3d 161,

186 (1970).  Thus, Zwick and Herskovitz are entitled to summary judgment if there is no genuine issue of material fact on the issue of accrual of Plaintiffs' claim before December 5, 2003.

## II. SUMMARY JUDGMENT OF PLAINTIFFS' IMPLIED-IN-FACT CONTRACT CLAIM SHOULD BE GRANTED AS TO ZWICK AND HERSKOVITZ  BECAUSE OF THE LACK OF PRIVITY

Summary judgment of Plaintiffs' implied-in-fact contract claim should be granted as to Zwick and Herskovitz because there is no privity of contract between Plaintiffs and these defendants.

Privity of contract between a plaintiff and a defendant is an essential element of a claim for breach of an implied-in-fact contract.  *See Benay*, 607 F.3d at 634 ("Privity between the parties is a necessary element of an implied-in-fact contract claim"); *Rokos v. Peck*, 182 Cal. App. 3d 604, 617 (1986) ("[T]he creation of an implied-in-fact contract on the one hand, and an agent, producer, or director, on the other hand, is of such a personal nature that it is effective only between the contracting parties . . . .  A cause of action for breach of an implied-in-fact contract bears upon the relationship between the individual parties and makes the breach of such agreements actionable between parties because of the nature of their *personal relationship*."); *Chandler v. Roach*, 156 Cal. App. 2d 435, 441 (1957) ("Unlike a copyright, a contract … is effective only between the contracting parties; it does not withdraw the idea from general circulation.  Any person not a party to the contract is free to use the idea without restriction").

According to *Nimmer*, in "many idea-submission cases, the party who allegedly used the plaintiff's idea is not the same one to whom the idea was submitted.  In these cases, there are limits on the reach of [contract claims].  Contract claims are valid only against those with whom the plaintiff was in 'privity.'  As a result, a contract action will fail if the person to whom the plaintiff submitted

the idea was not authorized – actually or apparently—to enter into contracts on behalf of the defendant."  4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 19.05[C] (2011).

For example, in *Donahue v. Ziv Television Programs, Inc.*, 245 Cal. App. 2d 593, 597-598 (1966), the plaintiff sued a television production company, Ziv, for breach of an implied-in-fact contract arising from the submission of plaintiffs' story outlines.  The plaintiffs also sued Tors, the producer of the defendants' allegedly "stolen" television show.  The Court of Appeal affirmed judgment notwithstanding the verdict as to Tors because of the absence of contractual privity – even though there was evidence that Tors had actual knowledge of plaintiffs' implied-in-fact contract with Ziv:

> Construing the evidence most favorably [for plaintiffs], there is a submission to Ziv, an implied promise by Ziv to pay if the idea was used, and a later employment of Tors under circumstances which indicate that at the time of the employment Tors was aware of Ziv's obligation to plaintiffs. . . .  While if plaintiffs' evidence is believed in toto, Tors' conduct may appear morally reprehensible, *we see no legal way of holding him liable for the debt of Ziv.*

*Donahue*, 245 Cal. App. 2d at 607-08 (emphasis added); accord *Mann v. Columbia Pictures*, Inc., 128 Cal. App. 3d 628 (Cal. App. 2d Dist. 1982) (affirming JNOV on plaintiff's breach of implied-in-fact claim against defendants Warren Beatty and Robert Towne, the star and screenwriter of the motion picture *Shampoo*, because of the absence of privity where the plaintiff submitted his work only to defendant Columbia Pictures).

To establish privity, Plaintiffs must have either: (1) submitted their script ideas directly to Zwick or Herskovitz; or (2) submitted their script ideas to someone

with actual or apparent authority to accept the submission on behalf of Zwick or Herskovitz.  Here, Plaintiffs did not do either.

### A.   Plaintiffs Did Not Submit Ideas to Zwick or Herskovitz

There is no evidence whatsoever that there was an implied-in-fact contract between plaintiffs and Zwick or Herskovitz because Plaintiffs never pitched, or provided either of them with a copy of, the Benay Screenplay at the time of the alleged formation of the implied-in-fact contract.  Rather, only Bedford Falls allegedly received Plaintiffs' "pitch" or had any opportunity to reject the implied-in-fact contract.  *See, e.g., Desny v. Wilder*, 46 Cal. 2d 715, 739 (1956) ("[u]nless the offeree has opportunity to reject he cannot be said to accept").

Without any contact between Plaintiffs and Zwick or Herskovitz, it is impossible for Plaintiffs to show they were in privity of contract with either of them. *See Benay*, 607 F.3d at 617; *Chandler*, 156 Cal. 2d at 441; *Donahue*, 245 Cal. App. 2d at 441; Nimmer at § 19.05[C].  Plaintiffs do not even assert that they had any contact with Zwick or Herskowitz.  In fact, neither Zwick nor Herskovitz ever met or spoke to Plaintiffs or their purported agent, Phillips.  Bedford Falls SS 13. Furthermore, neither Zwick nor Herskovitz ever received any submission of a screenplay by Plaintiffs or read the Benay Screenplay.

### B.   Solomon Was Not the Agent of Zwick or Herskovitz

Plaintiffs allege that their agent, Phillips, pitched the Benay Screenplay to Solomon.  But Solomon was employed by Bedford Falls, not by either Zwick or Herskovitz in their *personal* capacities.  Solomon was the President of Bedford Falls, and was compensated by and rendered services to and on behalf of Bedford Falls.  He was never employed by, and never rendered services to or on behalf of Zwick or Herskovitz.   Bedford Falls SS 14.  Furthermore, neither Zwick nor Herskovitz ever authorized Mr. Solomon to act on his behalf and, in particular, never authorized him to accept, or to hold himself out as being authorized to accept,

screenplay submissions on his behalf.  *Id*.  Accordingly, even if Phillips did pitch the screenplay to Solomon, there still would be no privity between Plaintiffs and either Zwick or Herskovitz.

Thus, Plaintiffs have no evidence supporting the existence of an implied- in-implied-in-fact contract with Zwick or Herskovitz.  Summary judgment is therefore appropriate.  *See Mann v. Columbia Pictures, Inc.,* 128 Cal. App. 3d 628 (1982) (noting that because there was no evidence that Plaintiff's script was submitted to a film's lead actor or screenwriter, but instead "that [her script] was [allegedly] submitted to defendant Columbia [,] the asserted contractual obligation exists, if at all, only between [plaintiff] and Columbia.").

## III.   SUMMARY JUDGMENT SHOULD BE GRANTED AS TO  BEDFORD FALLS, ZWICK AND HERSKOVITZ BECAUSE PLAINTIFFS' CLAIM ACCRUED MORE THAN TWO YEARS BEFORE THEY FILED SUIT

The statute of limitations for an implied-in-fact contract claim is two years. California Code of Civil Procedure § 339; *Blaustein, supra,* 9 Cal. App. 3d at 186. Under California law, a statute of limitations begins to run at the moment the cause of action becomes ripe: "A cause of action accrues when a suit may be maintained thereon, and the statute of limitations therefore begins to run at that time." *Dillon v. Board of Pension Com'rs of City of Los Angeles*, 18 Cal. 2d 427, 430 (1941); *see also County of San Diego v. Myers*, 147 Cal. App. 3d 417, 421 (1983) ("Generally, a cause of action begins to run when a suit may be maintained").  Thus, a cause of action accrues, and the statute of limitations begins to run, when a plaintiff has suffered harm (or, in some circumstances, when the plaintiff should reasonably suspect that he or she has suffered harm) from a breach of contract.  *Davies v. Krasna*, *supra*, 14 Cal. 3d at 514.  In the context of an implied-in-fact contract based on the submission of a work for television or film production, the issue is *whether*

*and when Plaintiffs should have reasonably suspected that they suffered appreciable and actual harm from the intended use of their ideas.  Id. at 511-12.*

**A.**   **A Claim for Breach of an Implied-In-Fact Contract Involving the Production of a Motion Picture Accrues Upon Plaintiffs' Notice of Any Sale or Other Exploitation of the Work**

A claim for breach of an implied-in-fact contract accrues at the very latest upon plaintiff's notice of the use of its ideas or work, *i.e.*, "*any sale or other exploitation*" of the idea or work without compensation.  *Davies, supra*, 14 Cal. 3d at 511-12 (emphasis added) (*citing Donahue v. United Artists*, 2 Cal. App. 3d 794, 801-802 (1969)) (claim for breach of an implied-in-fact contract arises "with the sale or exploitation of the idea").  The particular use the parties intended is determined from the "circumstances preceding and attending disclosure." *Blaustein,* 9 Cal. App. 3d at 182.

If an implied-in-fact contract claim involves the pitch of a film or television idea, the "use" may encompass any number of acts.  For example, "use" may "occur the moment a preliminary script is written embodying [plaintiffs'] idea, even if in fact no motion picture production, based upon such script, ever occurs." *Blaustein*, 9 Cal. App. 3d at 186.  Or, it may occur upon any other act of disclosure, use, misappropriation or conversion of the idea. *Haglund v. Dow Chemical Co.*, 218 U.S.P.Q 55, 69 (1982) ("the applicable statute of limitations began to run either upon [defendant's] first unauthorized 'disclosure' or 'use' or 'misappropriation' or 'conversion' of the idea. . .") (citations omitted, emphasis added).

In many cases, a plaintiff does not and cannot learn that an offending television show or film contains ideas that he or she pitched to another party under an implied promise to pay until after it is released.  Thus, unsurprisingly, some cases have found that the statute of limitations starts running as late as the public release of the work.  For example, in *Donahue*, plaintiff could only have learned of the

1  breach of the implied-in-fact contract through the public release of a television

2  series.  2 Cal. App. 3d at 801.  These cases are "notice" cases because they concern

3  the date by which plaintiff should reasonably have discovered the improper use or

4  exploitation of the ideas.  But, of course, there is no rule that the use of an idea or

5  literary property occurs only upon the film's release.  *See*, *e.g., Blaustein*, 9 Cal.

6  App. 3d at 186; *Haglund*, 218 U.S.P.Q at 69.

7         Thus, the question here is when Plaintiffs reasonably suspected or should

8  have suspected any use, disclosure or misappropriation of their ideas such that an

9  expectation of compensation arose.  *Davies*, 14 Cal. 3d at 511-12 (citing *Donahue*, 2

10  Cal. App. 3d at 801-802) (emphasis added).  As shown below, Plaintiffs' agent

11  answered that question unequivocally.

12      **B.      Plaintiffs' Agent, the Person Who Allegedly Formed the Implied-**

13             **in-Fact Contract, Established that the Intended Use of Plaintiffs'**

14             **Work Occurred When the Film Was Produced**

15         Based on the Court having granted summary judgment on Plaintiffs' copyright

16  claim, and the Ninth Circuit's opinion affirming summary judgment, it is established

17  that there is no substantial similarity between copyright protectable elements in the

18  Benay Screenplay and the Film.  Therefore, the only possible use of Plaintiffs' ideas

19  must relate to the unprotectable elements, *i.e.* the title, historical facts such as the

20  Satsuma Rebellion, the basic idea of an American interacting with the Samurai and

21  stock dramatic devices (or *scenes-a-faire*).

22         Phillips was the only person involved in forming the alleged implied-in-fact

23  contract with Bedford Falls; indeed, he is the only person who had any

24  communication with any Defendant with respect to the Benay Screenplay.  Phillips'

25  recent deposition testimony establishes the use intended by Plaintiffs and,

26  consequently, the date of accrual of their claim.

27

28

1      Phillips testified that, under the purported implied-in-fact contract with

2  Bedford Falls, the Benays would be owed compensation if the Benay Screenplay

3  was purchased by a studio or was "used in any way in the *production* of a feature

4  film."  Bedford Falls SS 17.  He said that if the screenplay was "involved in a

5  feature film [Solomon] was involved in producing, my client should be

6  compensated."  Bedford Falls SS 18.

7      Phillips testified specifically that, pursuant to the alleged agreement, the

8  Benays would get paid "at least some money at the time the literary property was

9  optioned or purchased."  Bedford Falls SS 19.  He further testified that Plaintiffs

10  also would be entitled to payment when principal photography of the film

11  commenced and when principal photography ended.  Bedford Falls SS 20.

12      Bedford Falls entered into a contract with Warner Bros. to develop and

13  produce the Film on October 5, 2000.  Bedford Falls SS 2.  Principal photography

14  commenced on the Film on March 12, 2003 and it ended on May 9, 2003.  Bedford

15  Falls SS 3.  Plaintiffs were not paid.  Therefore, Plaintiffs' claim accrued at that

16  time.

17      Plaintiffs filed this action on December 5, 2005.  Complaint dated December

18  5, 2003.  Therefore, if Plaintiffs had any reason to suspect any use, disclosure or

19  misappropriation of their ideas, including their title, before December 5, 2003, their

20  claim is time barred.  In fact, Plaintiffs knew long before then that Bedford Falls

21  was producing the Film for Warner Bros. based upon what they claimed to be the

22  ideas Phillips pitched to Bedford Falls, including the title, the historical setting and

23  the idea of an American soldier interacting with the Samurai.  For example, Aaron

24  Benay testified that on or about February 24, 2002, he read an article on

25  Variety.com by Michael Fleming reporting that Tom Cruise agreed to star in Zwick

26  and Warner Bros.' "The Last Samurai, a 19th Century epic about the eradication of

27  the samurai in Japan."  Bedford Falls SS 31.  Plaintiff Aaron Benay even recalled

28

1  having a conversation about this article with his brother, Plaintiff Matthew Benay,
2  around that date.  Bedford Falls SS 32.

3        Indeed, from October 2002 through May 2003, Plaintiffs's counsel, Glen
4  Kulik, sent a series of demand letters and, ultimately, a draft complaint to Bedford
5  Falls and Warner Bros., demonstrating that Plaintiffs knew the relevant facts and
6  asserting that by *producing* the Film, Bedford Falls "*is* contractually obligated to
7  pay compensation."  Bedford Falls SS 21-29.

8        Specifically, Kulik acknowledged that his clients obtained a draft of the
9  shooting script for the Film, which Plaintiffs claim is based on their screenplay, as
10  early as 2002, and Defendants' counsel sent him the revised shooting script on June
11  2, 2003.  Bedford Falls SS 23.  The draft and revised shooting scripts have the same
12  title as the Plaintiffs' screenplay -- *The Last Samurai;* the same historical setting –
13  Japan during the Satsuma rebellion in the late 19th Century, and the same idea of an
14  American soldier interacting with the Samurai.  *Benay*, 607 F.3d at 625.

15        In letters to Defendants' counsel, Kulik repeatedly claimed that breaches of
16  an implied-in-fact contract had occurred in 2002 and 2003, alleging that Plaintiffs
17  had been damaged thereby, and threatened a lawsuit.  Bedford Falls SS 21-29.  On
18  October 30, 2002, Kulik wrote that "there is good reason to question the origin of
19  your script, which destroyed the potential market value of an important piece of
20  work that took [Plaintiffs] years to create and develop . . . ."  Bedford Falls SS 25.
21  On May 12, 2003,  Kulik sent a draft complaint, which he said Plaintiffs "plan to
22  file," stating:

23      Because they are *producing* the Film and *planning* to release it to the public,
24      [Bedford Falls] was and is contractually obligated to pay compensation and
25      afford screen credit to the Benay Bros.  *In late 2002, [Bedford Falls]*
26      *breached the [implied] contract by notifying [Plaintiffs] it would not pay the*
27      *promised compensation* or give the promised screen credit.

28

MSJ OF DEFENDANTS BEDFORD FALLS COMPANY, EDWARD ZWICK AND MARSHALL HERSKOVITZ

1 | Bedford Falls SS 27.  (emphasis added).

2 |      On May 20, 2003, Kulik wrote, "This is the final letter that I am going to

3 | write.  . . .*We will wait until the end of May to receive [the promised documents].  If*

4 | *we do not, we will . . . file the complaint*."  Bedford Falls SS 28.  (emphasis added).

5 |      These facts – which demonstrate that Plaintiffs knew that principal

6 | photography had begun on the Film, that the Film bore elements upon which their

7 | implied-in-fact contract claim is based, and that they believed they were damaged

8 | by the use of their ideas in the Film – establish that Plaintiffs' claim accrued more

9 | than two years prior to its filing.[3]

10 |      When the issue of the statute of limitations came before the Court previously

11 | (and when the case was on appeal), it appeared that there was a question of fact as to

12 | the use of Plaintiff's ideas that would commence the running of the statute of

13 | limitations.  *See* 4/25/07 MSJ Order at 4 ("Plaintiffs have raised a triable issue

14 | regarding the accrual date of the action" because the "claim hinged on whether use

15 | as defined by the implied-in-fact contract between the parties occurred when

16 | Defendants 'produced and distributed' a motion picture as opposed to whether they

17 | simply 'produced' or 'developed' material based upon the allegedly stolen idea.")

18 |      *Now,* with the unambiguous testimony of Phillips, it cannot be disputed that

19 | the use intended by Plaintiffs when they allegedly submitted the Benay Script to

20 | Bedford Falls was the "production" of a film using Plaintiffs' ideas "in any way,"

21 |

22 |

23 |    [3]  Plaintiffs cannot claim that they had to wait for the Film to come out to

24 | determine the extent to which their ideas were copied in the finished work.  This need to wait may have existed with respect to the claim for copyright infringement, which would have required a comparison of the substantial similarities in the artistic

25 | expressions in the two works; accordingly, the first date of public release may well

26 | have been an appropriate date of accrual for Plaintiffs' copyright infringement claim for relief.  However, Plaintiffs obviously cannot claim that they were unaware of the

27 | use of their ideas, such as the title of the film, by May 2003.

28 |

1   and that the contract provided that Plaintiffs' would be paid compensation upon the

2   sale to a studio, the commencement of principal photography and the completion of

3   principal photography.  There no longer can be any doubt that each of these events

4   occurred, and that Plaintiffs knew of the alleged breach of the implied-in-fact

5   contract, more than two years before they filed suit.

6          As noted above, *Blaustein* makes abundantly clear that many facts other than

7   a film's release could constitute use and, in fact, use may occur as early as when

8   another script is based on a plaintiff's idea, even if no motion picture is ever

9   produced.  *Blaustein*, 9 Cal. App. 3d at 186.  *Blaustein* also states that the operative

10  use implied by the contract must be determined from the parties' intent and

11  expectations as evidenced from their words and conduct under the circumstances.

12  *Id*. at 182.

13         Here, Phillips clearly testified as to the specific intent and expectations of the

14  Plaintiffs *at the time of submission*, and that intent was most definitely *not* that they

15  be compensated only upon the release of the Film.  Furthermore, Phillips' testimony

16  as to Plaintiffs' intent cannot be disputed by anyone else, because Phillips was the

17  sole person who interacted with any Defendant and the sole person responsible for

18  forming the implied-in-fact contract on Plaintiffs' behalf.  Thus, the Court's prior

19  question about the "use" that triggered Plaintiffs' expectation of payment – *i.e.*

20  whether both the "production *and* distribution" of the Film would be required to

21  constitute a breach – is answered by the new evidence.

22         The undisputed facts clearly show that Plaintiffs had notice of the use of their

23  ideas under the "sale or exploitation of the idea" definition elucidated in *Davies,*

24  *Blaustein* and *Donahue*, at least by May 2003.  In fact, *all* of Bedford Falls' fixed,

25  non-contingent compensation due under its services arrangement with Warner Bros.

26  was due prior to the release of the Film.  Bedford Falls SS 2.  Because Plaintiffs

27

28

MSJ OF DEFENDANTS BEDFORD FALLS COMPANY, EDWARD ZWICK AND MARSHALL HERSKOVITZ

1  waited more than two years before bringing suit, their claim is barred by the statute

2  of limitations.[4]

3  **Conclusion**

4       For the foregoing reasons, Defendants The Bedford Falls Company, Edward

5  Zwick and Marshall Herskovitz respectfully request that the Court enter summary

6  judgment in their favor and against the Plaintiffs on the First Amended Complaint

7  and all claims for relief alleged therein.

8

9  DATED:  December 19, 2011   QUINN EMANUEL URQUHART
10                       & SULLIVAN LLP

                     BAKER MARQUART LLP
11

12                       By    /s/ Gary E. Gans
13                           Gary E. Gans
14                           Attorneys for Defendants Bedford Falls
                         Company (erroneously sued as Bedford Falls
15                           Productions, Inc.), Edward Zwick and Marshall
                         Herskovitz

16

17

18

19

20  ————————————

21     [4] As noted above, several authorities – such as *Davies*, *Donahue* and *Blaustein* –

22  have observed that a cause of action for breach of an implied-in-fact contract may

23  well occur prior to the public exhibition of a film if the intended use that triggered an expectation of compensation occurred prior to the release date.  Plaintiffs

24  apparently contend that implied-in-contract claims accrue only on the release date of the film.  Such a rule would yield inherently illogical and implausible results.  For

25  example, it is often the case that a script will be optioned or purchased but never

26  produced.  If it were true that implied in fact claims only arise on the release date, then implied-in-fact contract claims based on optioned or purchased scripts not

27  produced (and therefore not released) would never accrue.

28

MSJ OF DEFENDANTS BEDFORD FALLS COMPANY, EDWARD ZWICK AND MARSHALL HERSKOVITZ