QUINN EMANUEL URQUHART & SULLIVAN LLP
Gary E. Gans (Bar No. 89537)
865 South Figueroa Street, 10th Floor
Los Angeles, California  90017-2543
Telephone:  (213) 443-3000
Facsimile:  (213) 443-3100
Email:     garygans@quinnemanuel.com

BAKER MARQUART LLP
Jaime W. Marquart (Bar No. 200344)
10990 Wilshire Blvd., Fourth Floor
Los Angeles, California  90024
Telephone:  (424) 652-7800
Facsimile:  (424) 652-7850
Email:     jmarquart@bakermarquart.com

Attorneys for Defendants The Bedford Falls Company (erroneously sued as Bedford Falls Productions, Inc.), Edward Zwick and Marshall Herskovitz

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| AARON BENAY, an individual, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>WARNER BROS. ENTERTAINMENT, INC., a Delaware corporation, *et al.*,<br><br>Defendants. | CASE NO. CV 05-8508 PSG (FMOx)<br><br>**DEFENDANTS THE BEDFORD FALLS COMPANY'S, EDWARD ZWICK'S AND MARSHALL HERSKOVITZ'S REPLY IN SUPPORT OF MOTION *IN LIMINE* NO. 1 TO EXCLUDE TESTIMONY OF PLAINTIFFS' EXPERT PETER HELLER**<br><br>Date Filed:  December 5, 2005<br>Trial Date:  March 20, 2012 |

-1-
REPLY ISO MOTION IN LIMINE NO. 1

## Introduction

Plaintiffs should be prevented from offering the testimony of their proposed expert, Peter Heller, based on the standards of Federal Rule of Evidence 702, <u>Daubert v. Merrell Dow Pharmaceuticals</u>, 509 U.S. 579 (1993), and the other authorities cited in Defendants' moving papers. Heller should not be allowed to testify because (i) there is no reasonable basis for his opinions, most of which are admittedly "conjecture"; (ii) he has no experience with implied-in fact contracts; (iii) many of the opinions are based on incorrect legal standards; and (iv) Heller's other opinions constitute legal conclusions or mere recitations of another witness's declaration.[1]

## Argument

**A.    Heller's Opinions Regarding the Submission and Receipt of the Benays' Screenplay (Topic One) Is Inadmissible**

In their attempt to introduce inadmissible and prejudicial testimony, Plaintiffs attempt to disguise their expert's opinions concerning the submission and receipt of their screenplay, claiming that Heller's opinion merely describes the "custom and practice" regarding the "submission of a writer's work to a potential buyer." Opposition at 2:4-5. While Defendants do not contest Heller's qualifications to testify about the custom and practice attending submission of a screenplay, his purported testimony goes further.

Heller first opines that "[t]he Benays submitted their screenplay entitled 'The Last Samurai' to defendants and the defendants received it." Heller Report, page 3, Marquart Decl. Ex. A at 16. However, that opinion is based exclusively on his

---

[1] Plaintiffs' argument that Heller is "qualified" misses the point. Although Heller apparently has been a film producer for a number of years, he has *no* experience with implied-in-fact contracts, *no* experience on which to base his conclusions about the formation and breach of the alleged contract and *no* basis for a valuation of the elements of Plaintiffs' screenplay allegedly used by Defendants.

reading of the 2007 declaration of Plaintiffs' agent, Dave Phillips. Heller Depo., Vol. I (2008) at 30:22-31:17, Marquart Reply Decl. Ex. A at 3, Vol II. 62:10-15 (2012), Marquart Reply Decl., Ex. B at 17. Accordingly, Heller's opinion on that issue is a factual issue for the jury, which can evaluate Mr. Phillips' testimony when he testifies at trial.

Second, Heller states that the methods used by Phillips in pitching the screenplay are standard practices in the industry. Heller Report, page 3, paras. 2 and 3, Marquart Decl. Ex. A at 16. In this regard, Heller's testimony assumes that Phillips in fact pitched the screenplay. Although Defendants do not believe that this opinion is helpful to the jury which will decide the factual issue of whether Phillips actually pitched and sent the screenplay to Defendants, Defendants recognize that Heller does have a basis for testifying to this narrow issue.

Third, Heller asserts screenplays are routinely accepted and reviewed by studios and production companies without entry into submission logs and that the "haphazard submission policies employed by Bedford Falls" show that "a screenplay received by Bedford Falls could easily bypass their submissions log." Heller Report page 3, para. 4, Marquart Decl. Ex. A at 16. But Heller has *no* experience or knowledge as to what the practices are at studios or production companies, especially at Bedford Falls. At his deposition, Heller was unable to identify a single aspect of Bedford Falls' submission policies that allegedly were "haphazard" or otherwise inadequate. Heller Depo. Vol II (2012) 88:9-16, Marquart Reply Decl. Ex. B at 20. Plaintiffs do not even attempt to justify this opinion. It should be excluded.

**B.** **Heller's Opinions Regarding the Alleged Formation and Breach of the Implied-In-Fact Contract (Topic 2) Should Be Excluded as Legal Conclusions**

Plaintiffs also misrepresent Heller's second set of opinions, characterizing them as "custom and practice" as to the use of, and the payment of compensation

for, projects submitted to production companies. Opposition at 4:9-5:2. But Heller's actual opinions are simply conclusions of law. He opines that an implied-in-fact contract was created and was breached. In this respect, Heller's report contains the following brazen legal conclusions:

> An implied-in-fact contract was clearly created between the defendants and the Benays at the time the screenplay was submitted and used in the production of the defendants' film. At the time the film was released, it was evident defendants breached their implied contract . . . .

Heller Report at p. 4, Marquart Decl. Ex. A at 17. Not only are these opinions obviously legal conclusions, but Heller has no experience or knowledge to support these opinions. Not surprisingly, Plaintiffs do not address these issues.

Indisputably, whether a contract has been created, and whether it has been breached, are legal conclusions which must be excluded. *See* <u>Aguilar v. Int'l Longshoreman's Union Local No. 10</u>, 966 F.2d 443, 447 (9th Cir. 1992). Plaintiffs' attempt to package these impermissible legal conclusion testimony as simple "custom and practice" is disingenuous. Heller's purported testimony – that "according to the custom and practice in the entertainment industry . . . a production company cannot simply use a submitted idea without compensating the owner and creator of the material" – is not be admissible expert opinion; rather, it is an overly simplistic and inaccurate recitation of the law of implied-in-fact contracts.

Furthermore, Heller has *no* experience with implied-in-fact contracts (other than being aware of lawsuits involving such claims). He testified:

> Q.   So you have no experience with implied-in-fact contracts and having writers being paid either as a buyer or a seller? And again, apart from litigation.
>
> A.   Correct.

Heller Vol. II at 95:1-4, Marquart Reply Decl. Ex. B at 22.

Plaintiffs avoid argument on these issues, because they have nothing to argue. Heller's testimony should be excluded.

## C. Heller's Opinions Regarding the Value of the Benays' Screenplay (Topic 3) Admittedly Are "Conjecture" and Are Based on an Improper Measure of Damages

### 1. Heller's Opinions About Value Are Speculative

The parties agree, to determine damages, the trier of fact must determine the value of what in the Benays' screenplay, if anything, was used by Defendants. Opposition at 5:4-5. The evidence is undisputed that the fair market value of the Benays' screenplay was established by Plaintiffs' contract for the sale of their screenplay to New Regency for $150,000. Heller admits it is impossible to place any other value on the screenplay and that any other valuation opinion would be speculative.

Plaintiffs' agent, Dave Phillips, pitched the Benays' screenplay to a number of potential buyers. He received only one offer – from a friend of his at New Regency – and "sold it for the best that [he] could get." Deposition of David Phillips at 70:3-12, Marquart Reply Decl. Ex. C at 30. The deal was that New Regency would option the screenplay for $40,000 against a total payment of $150,000 (i.e., an additional $110,000) if it exercised the option. As Heller testified repeatedly, $150,000 was therefore the "*fair market value*" of the screenplay. Heller Vol. I, 60:10-23, Marquart Reply Decl. Ex. A at 5; Heller Vol. II (2012) 33:24-34:8, Marquart Reply Decl. Ex. B at 11-12.

Plaintiffs argue that the terms of the New Regency transaction constitute "price," not "value." Initially, that is a distinction without a difference. Of course, Plaintiffs cannot even cite authority for that distinction. In any event, Heller testified that the New Regency price constituted the "fair market *value*." *Id*.

Nevertheless, Plaintiffs assert that Heller can testify that their damages are some unspecified amount far in excess of fair market value based on the gross

revenues from the film.  Not surprisingly, they neither state what that amount is nor provide any basis for calculating any such amount.  Indeed, any testimony by Heller as to another value would be pure guesswork.  Heller testified:

> Q. What is the value of the screenplay in your opinion?
>
> A. The value of the screenplay, in my opinion, is what a screenplay at that time would have sold for.  Now this is different than damages, of course.  So you know.  But the value of the screenplay, *it is impossible to determine* in a sense because it wasn't used appropriately in this situation.

*Id.* at 60:12-18 (emphasis added).

Therefore, Heller has never given an opinion as to the amount of the value of what may have been used by Defendants other than the $150,000 fair market value of the screenplay and has never provided any basis for any other valuation.  In fact, he cannot do so for a number of reasons.

Because he performed no comparison of the Benay Screenplay and the film, Heller has no idea what, if anything, was used by Defendants.  *Id*. at 16:24-17:1.  And, Plaintiffs have no other expert to testify on that issue.  Consequently, Heller admitted that he "can't value what was used because [he doesn't] know what was used."  *Id*. at 45:25-46:12.

Further, according to Heller, whether the Plaintiffs received credit from the Writers Guild of America would affect the value of the screenplay and he does not know whether the Benays would have received credit (and, again, Plaintiffs have no other expert).  Accordingly, he admitted that it is "impossible to value the screenplay according to [his] theory of value."  *Id*. at 48:4-17.

In addition, Heller cannot value the constituent parts of the screenplay that may have been used by Defendants.  *Id*. at 130:15-18.  Although many things contributed to the success of the picture, such as Tom Cruise's acting and Zwick's directing, Heller cannot break down the value of the various aspects of the

screenplay or the production. *Id.* at 137:12-138:3. Among other things, Heller cannot value the title or the use of the historical time period. *Id.* at 123:22-24; 134:17-21. Consequently, there is absolutely no way to apportion the revenues from the film so as to ascribe any amount to the use of material from the Benays' screenplay.

Thus, Heller is unable to testify as to any value for the Benays' screenplay, or anything allegedly used by Defendants, other than the fair market value of the screenplay of $150,000. *Id.* at 70:23-71:12. Heller had to admit that *all* of his testimony as to the value of the Benays' screenplay was speculation:

Q. And in fact, all of your testimony as to the value of the script is conjecture, isn't it?

A. Well, it has to be because at the time Ed Zwick didn't acquire the script . . . .

Speculation by experts clearly is inadmissible. Daubert, 509 U.S. at 588-90. In particular, courts exclude expert damage opinions when based on speculation. *See, e.g.*, McGlinchy v. Shell Chem. Oil, 845 F.2d 802, 807 (9th Cir. 1988); Group Health Plan, Inc. v. Phillip Morris USA, Inc., 344 F.3d 753, 760 (8th Cir. 2003). Heller's valuation opinions are speculative and are therefore inadmissible.

### 2. Heller's Opinions About Value Are Based on an Improper Measure of Damages

As discussed more fully in Defendant's Reply to Motion *In Limine* No. 2, Heller's opinion is based on an incorrect tort measure of damages. The proper measure of damages for breach of an implied-in-fact contract is the *fair market value* of the property at the time of submission. Desny v. Wilder, 46 Cal. 2d at 737; Mann v. Columbia Pictures, Inc., 128 Cal. App. 3d 628, 632 (1982) ("[P]laintiff's potential recovery was restricted to the 'reasonable value' of her ideas allegedly used in the production of 'Shampoo.' Evidence relative to the motion picture's earnings and number of showings was irrelevant."); *see also*, Reply in Support of Motion *In*

*Limine* No. 2, Section A. In this case, as Heller testified, Plaintiffs' contract with New Regency establishes the fair market value of the Benay Screenplay, *i.e.* $150,000. Opposition, page 5, fn. 2.[2]

Nevertheless, Plaintiffs' claim that <u>Donahue v. United Artists</u>, 2 Cal. App. 3d 794 (1969), supports an after-the-fact measure of value based upon gross revenues from the film and the gross income Defendants ultimately obtained from the film. Plaintiffs' reliance on <u>Donahue</u> is misplaced for several reasons.

First, even taken *out of context*, the passage in <u>Donahue</u> quoted in Plaintiff's Opposition (at 6:2-7) does not support the damage measure Heller uses, nor does it support the "price versus value" distinction Plaintiffs claim it stands for. All that the passage says is that "value for exchange," *i.e.* market value, may not *always* be the "only value" used to determine damages. Rather, if the "market test fail[s]," another measure contemplated by the parties may be used. <u>Donahue</u> merely reflects that sometimes a market value test may fail, not that a plaintiff in a mere breach of contract case may receive a punitive sum based upon all of a defendant's revenues from an endeavor merely because the defendant impliedly contracted for the use of some of plaintiff's property.

Here, the market test does not fail. Plaintiffs and Defendants agree on the market value of the screenplay -- $150,000. Under <u>Donahue</u>, that is a correct measure of damages and there is no reason to employ a measure based on some apportionment of the Defendants' gross revenues.

Furthermore, the damage measure applied in <u>Donahue</u> was based on very different facts that supported an exception to the usual measure of damages. First, there was no ascertainable market value for the idea, *i.e.* the market test failed.

---

[2] Defendants believe that the New Regency transaction still overstates the market value of what was allegedly used by Defendants because, if Defendants used anything at all (which they deny), they used only some of the Benays' screenplay.

Second, the parties contemplated several different compensation models, including payment of royalties. Defendant's vice-president, Gordon, testified as to several potential means of compensation discussed with plaintiffs:

> And I told them, 'There are several types of deals. There is a royalty deal, royalty payment deal, . . . a percentage of profit deal, a personal service deal to be determined to what extent they could contribute to the project . l. l. and an outright buyout deal . . . .

<u>Donahue v. Ziv Television Programs</u>, 245 Cal. App. 2d 593, 603 (1966). As is clear, the potential method of compensation contemplated by the parties in <u>Donohue</u> included profit participation and royalty payments. Therefore, the trial court's award of a royalty-based measure of damage was upheld because it was a measure of compensation expressly contemplated by the parties.

Here the situation is very different. First, there is no uncertainty regarding the market value – Heller testified that $150,000 was the fair market value at the time of the option to New Regency. There is absolutely no uncertainty as to market value at the relevant time according to Plaintiff's own expert.

Moreover, there is no evidence, indeed there is not even an allegation, that anyone contemplated any measure of compensation other than the fair market value at the time of the alleged contract formation.

Finally, neither <u>Donahue</u> nor any other authority holds that an expert may offer conjecture as to how much of a defendant's revenue constitutes a reasonable amount of damages. There simply is no basis for determining any royalty rate or for attributing any amount of the revenues from the film to Plaintiffs' damages. Heller admittedly does not calculate or ascertain the value of what Defendants allegedly used. In fact, Heller did not even attempt to take any gross dollar amount of revenue or income and crunch the numbers to derive a fair market value. Thus, even though only a fraction of Plaintiffs' ideas were allegedly used, Heller never estimates what that fraction is, nor does he derive any actual (or even approximate) value

therefrom. Accordingly, he may not testify to any value of such use. *See*, *e.g.*, Cornell University v. Hewlett-Packard Co., 609 F. Supp. 2d 279, 283 (N.D.N.Y. 2009), judgment amended 2009 WL 1405208 (N.D.N.Y. 2009) (excluding expert's damage calculation based on "the revenue from [defendant's] entire server and workstation systems" when the infringing product was merely one component of those systems); IP Innovation LLC v. Red Hat, Inc., 705 F.Supp. 2d 687 (E.D. Tex. 2010) (rejecting expert's proposed royalty base because the alleged infringement involved one component of the accused software).[3]

### D. Heller's Opinion Regarding Consequential Damages (Topic 4) Uses an Improper Legal Standard and Is Baseless

Plaintiffs argue that Heller may testify that, because this case involves an implied-in-fact rather than an express contract, Plaintiffs are entitled to an unspecified amount of damages based on the future impact on their careers of the alleged breach of contract. Of course, Plaintiffs cite no authority for this proposition. The law is to the contrary, as described in detail in Defendants' Reply in Support of Motion *In Limine* No. 2, Section A. Moreover, Heller has no experience or knowledge to support this opinion and any damages based on the opinion would be speculative.

Plaintiffs re-hash the argument that Heller may indulge in speculation because uncertainty of damages does not preclude recovery. But that is not the issue. No authority cited by Plaintiffs provides that expert testimony that lacks foundation, is speculative and/or is based on an improper legal standard becomes admissible because the damages are uncertain.

---

[3] Significantly, these authorities support Defendants' contention that the fair market value of the Benays' screenplay pursuant to the New Regency transaction is an overestimation of damages because, *at most*, Defendants used only a portion of that screenplay.

**E.     Heller's Report Violates Federal Rule of Civil Procedure 26(a)(2)(B)**

Plaintiff's attempted justification of its counsel's drafting of Heller's expert report is based on misleading statements.  For example, Plaintiffs write: "[Heller] testified that he did not cut and paste from the earlier draft and that there are quite a few significant changes between the initial draft and his report."  Opposition, page 11.  However, the actual testimony tells a different story.  The only "significant changes" Heller testified to did not relate to the substance of the report or opinions, but rather to formatting issues like templates and the page number with his signature.  Heller Vol I 99:1-10, Marquart Reply Decl. Ex. A at 6.  When Heller testified that he did not "cut and paste," he just meant that he re-typed the report sent to him.  Plaintiffs do not even attempt to identify any substantive change between the "draft" report prepared by the lawyers and the report Heller claims to have "drafted" himself.

Plaintiffs cite Marek v. Moore, 171 F.R.D. 298, 302 (D. Kan. 1997).  But that case is readily distinguishable.  There, an expert prepared a report which he submitted to counsel.  The lawyers made authorized revisions, fleshing out certain parts of the report.  Here, the lawyers did not revise Heller's report, they authored it.

Similarly, in Indiana Ins. Co. v. Hussey Seating Co., 176 F.R.D. 291, 293 (S.D. Ind. 1997), the report at issue contained a "Tab D" including opinions and bases for those opinions that was prepared by the expert himself.  Moreover, the court there found that the report failed to comply with FRCP 26 because of counsel's "rendering so much assistance."

As discussed in Defendants' moving papers, Plaintiffs' counsel went far beyond acceptable supervision of Heller's report and actually drafted it.  Therefore, it is inadmissible.

DATED: March 16, 2012

QUINN EMANUEL URQUHART & SULLIVAN LLP

BAKER MARQUART LLP


By /s/ Gary E. Gans
    Gary E. Gans
    Attorneys for Defendants Bedford Falls Company (erroneously sued as Bedford Falls Productions, Inc.), Edward Zwick and Marshall Herskovitz